Robert **PILKINGTON**, Individually and on behalf of all others similarly situated

v.

Joseph J. **BEVILACQUA**, Individually and in his capacity as Director of Department of Mental Health, Retardation & Hospitals, et al.

Civ. A. No. 77–0190.

United States District Court, D. Rhode Island.

Sept. 30, 1977.

John M. Roney, Lynette Labinger, Providence, R. I., for plaintiff.

Forrest Avila, Sp. Asst. Atty. Gen.—R. I., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

In this civil action for injunctive and declaratory relief and for damages, the plaintiff claims his summary discharge from state employment is violative of the First

and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983 and state law. Jurisdiction is conferred pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and its powers of pendent jurisdiction.

## Findings of Fact

Plaintiff Robert Pilkington was dismissed by the defendants in this case on April 1, 1977 from his employment with the Rhode Island Department of Mental Health where he had been an administrator in an inpatient mental health unit for the prior three months. The dismissal occurred without prior warning in a meeting with defendants Reidy, Angelini and Hickey who, as his superiors, stated that they were dissatisfied with his work. Yet the defendants had little direct knowledge of Pilkington's work and never consulted with the chief medical officer of the unit regarding the plaintiff's performance. On the previous day these three had met privately and reviewed various criticisms the plaintiff had leveled against these men's current policies. The evidentiary question facing this Court is: to what extent did Mr. Pilkington's expression of criticism cause the defendants to fire him and to what extent did they have independent grounds related to his job performance for their decision?

It is necessary to review in detail conditions leading up to the April 1 firing to understand the First Amendment interests at stake. In or about October, 1976, the plaintiff applied for the position of unit program manager for the Northern Rhode Island (NRI) Unit of the Institute of Mental Health (IMH), a state hospital administered by the Rhode Island Department of Mental Health, Retardation and Hospitals (MHRH). The defendants are MHRH and certain officials of MHRH and IMH. This position was created as a result of the complete restructuring of the IMH, in its effort to obtain accreditation by conforming with certain standards required by the State of Rhode Island and the United States. As part of a program referred to as "unitization"[1] nine physically distinct and separately staffed units or departments were formed with a managerial position for each, termed "Unit Program Manager". As a result of his application and subsequent screening, the plaintiff was hired and assumed his duties on or about January 3, 1977. He was asked for and gave a commitment of two years of service, having previously been advised that his employment was conditioned upon his taking and passing a civil service examination when given. Mr. Pilkington's job was, in effect, to organize a new mental hospital and to do so immediately.

Under unitization, each unit was a mini-hospital with its own administrator (program manager) and its own professional (physicians, clinical psychologists, social workers, and activity and occupational therapists) and non-professional (attendant) staff, which, in toto, numbered 110 persons. Soon after beginning work, Mr. Pilkington organized the staff into a "Unit Council" to create a democratic atmosphere, to facilitate staff participation in the decision-making process and to help the staff cope with the difficult transitional period during unitization. Though the unitization goals had been announced for several years, the plan was implemented abruptly and obviously without complete preparation. Patients who were familiar with fellow patients were transferred; surroundings and old routines were uprooted. This caused patients to react negatively and become highly agitated. The staff, in turn, in its attempt to cope with the emotional problems, resorted to medication to subdue or tranquilize the patients.

---

1. The theory and goals of unitization were described by the MHRH as follows:

Unitization is a form of psychiatric hospital organization developed in the United States over 20 years ago. It is a process whereby patients and staff are decentralized into a series of treatment and care units, and clinical and administrative decision-making authority is devolved to these units, from the central hospital authority. IMH consists of nine units—three geographic units and six statewide special treatment units.

1. Authority is passed down from the Hospital Administration to the Program Manager who is the administrator for each unit.

Exacerbating this difficult situation was a general confusion caused by inadequate office space for the staff; on-going painting during the move; shortage of furniture; lack of physical necessities including beds, clothing, shoes, linen, and towels; lost, misplaced and outdated medical records; lack of a centrally controlled service for supplies; and an increase in overtime from $40,000 per two-week period to $80,000 per pay period. In general, it is conceded by the defendants, a chaotic condition prevailed.

It was in this atmosphere of confusion and pressure that the IMH, scheduled to be inspected for accreditation, launched a crash program to shape its house in a manner which seemed most likely to satisfy the examiners. The officials, feeling that documentation and correction of records was of prime importance for accreditation, set a target date to accomplish this task; but it became an unduly burdensome job because it entailed correcting past deficiencies while at the same time fulfilling current documentation requirements without a sufficient staff or the use of overtime. The plaintiff contended, and the Court so finds, that it was impossible to do all this and in fact provide the patient care and therapeutic environment mandated by the various health laws.

The plaintiff's reaction to the officials' insistence on administrative priorities is actually the core of the present controversy: he voiced opposition, stating that the administrative demands should not be at the expense of staff morale and patient care. The end result was the claimed exercise of First Amendment rights by the plaintiff culminating in his being fired and this law suit. For example, the plaintiff and the Unit Council made their feelings known and either criticized or voiced objections in the following ways: they contended that the inordinate effort being consumed in paperwork left insufficient time to care properly for and treat patients; they opposed further admissions in their unit, stating they would accept patients only under protest and under certain conditions; on or about March 9, when needed supplies were not forthcoming, the plaintiff threatened to notify the press and lead his unit in a walkout; they opposed staff reductions; they disfavored vocally the dispensation of medicine by personnel not licensed to do so; when ordered to prepare 50 treatment-care plans per week, the plaintiff and the council argued they had determined that at most 30 plans could be done per week if they were to comply with the mental health laws. Moreover, during a meeting of the Governor's Council on Mental Health, the plaintiff disagreed with defendants Reidy and Angelini over the issue of staff quality and invited and encouraged outside groups to tour his unit. On an occasion when an attendant threatened to call her congressman and Dr. Bevilacqua to protest conditions at the IMH, the plaintiff refused to attempt to stop her. And at a hearing concerning whether or not a patient should be certified for retention at the IMH, the plaintiff testified on behalf of the patient contrary to IMH's position and stated that he believed the patient was not a danger to himself or others and should not be held at the hospital against his will. Hindsight demonstrates that Pilkington's general position was correct that unitization and the meeting of certain standards could not be accomplished as quickly as defendants wished.

In hearing this testimony, it was inescapable for this Court reasonably to infer that the defendants considered this conduct cantankerous and resistive of their demand that an all-out drive be made to accomplish those things they deemed indispensible to accreditation. As to the dispensation of medicine by unauthorized personnel, the plaintiff was told to drop the issue because it was very touchy and complex. The response to the 30 treatment-care plans instead of 50 was, "Forget the god damn Mental Health Law; I want 50 a week—do them." The reaction to the plaintiff's invitation to the public to tour the unit was a directive not to be so open—make the groups, "fight for their information." And as to the protest against further admissions, the plaintiff was told never again to accept

a decision of the administration under protest.

On the other hand, the plaintiff's conduct had a positive effect on the personnel and patients. Mark Muradian, the clinical psychologist in the NRI, testified that from a condition of total chaos which did not "carry on even a minimal patient care", the plaintiff's leadership, advocacy and concern for patients heightened morale and improved the therapeutic environment.

This witness stated that the plaintiff was fired because he openly criticized the existing conditions; he further stated that firing the plaintiff so "shocked" him, he, the witness, is presently "less willing" to express his own views. In like manner, Linda Poole, a clinical social worker, testified that the central administration didn't seem to be concerned with how much time was being spent with the patients. Instead, the interest was in, "how many treatment plans are completed", how many reports completed; the administration was "only interested in numbers, not concerned about quality". She believed the plaintiff was fired because he was so outspoken and that once he was fired, "all became concerned and feared anyone who had worked with him would be next."

One staff member termed the therapeutic milieu under the plaintiff the best she had seen in 9 years at IMH. One disinterested physician who did not work for IMH but who saw patients at NRI testified that treatment at NRI was good and that the unit was cleaner and more efficiently operated than other units he visited.

It is also relevant to note that soon after the plaintiff's appointment, his present superiors learned that he had, during his previous employment with a private organization, written a strongly worded letter to John Affleck, Director of Rhode Island Department of Social and Rehabilitative Services, critical of department officials relative to their stand on general public assistance benefits. Defendant Dr. Angelini, Assist-

ant Director directly below Dr. Bevilacqua, received a copy of this letter (hereinafter sometimes referred to as the SRS letter) and evinced grave concern. He questioned whether he would have hired the plaintiff had he known of this correspondence at the time the plaintiff's application was being considered.

Angelini, Mr. Reidy, Dr. Richardson and Mr. Silver [2] met on March 31st to discuss Pilkington's continued employment. Angelini had at a prior date acquainted the others with the contents of Pilkington's letter to Affleck (Dr. Angelini has testified that the letter played no part in the firing). Each had also seen, prior to the meeting, a March 11th memorandum which recited the plaintiff's March 9th threat to call the press. At the meeting Dr. Richardson spoke of the plaintiff's negative attitude toward accreditation. He also made known his appraisal of the NRI unit from which he concluded Mr. Pilkington could not perform adequately; this appraisal contained several inaccuracies. The others seemed to have little firsthand knowledge of Pilkington and the NRI. It is not clear if at the conclusion of this meeting it was decided to fire Pilkington or merely recommend to Dr. Bevilacqua that he be discharged. On April 1, after the plaintiff had testified against commitment at the certification hearing, he was directed to attend a meeting with Mr. Hickey, Mr. Reidy and Dr. Angelini, at which time he was told his employment was terminated as of that moment. Although the defense contends, as will be developed, *infra*, that the plaintiff was fired because of poor job performance, they offered the plaintiff, at the April 1 meeting, two weeks severance pay (this was later increased to four weeks) and a good reference if he would resign. The plaintiff refused. At no time did the plaintiff know of the March 31 meeting nor was he previously ever told his job was in jeopardy.

The defendants argue that under no circumstance did they terminate the plaintiff's

---

2. Mr. Silver's only knowledge of Pilkington was his threat to "go public" if supplies and repairs were not forthcoming.

employment because a First Amendment right had been exercised. To the contrary, they claim he was terminated because his "job fell quite short of being satisfactory" in that he "had failed to properly organize fire drills"; did not submit reports on time; "failed to properly establish treatment teams [and] had misled [Dr. Richardson] on several occasions." (Def. brief, pp. 11, 12.) The defendants also testified that the plaintiff was not following directives on the question of overtime and staffing; that his nursing schedules did not conform with the terms of the collective bargaining agreement in effect between the nurses and IMH; and that he failed to bring preparation and admission forms up to date.

■ It is not for this Court to evaluate Mr. Pilkington's job performance and substitute its judgment for that of the defendants. However, it is this Court's responsibility to determine if the reasons voiced by the defendants, whatever their merit, were indeed the true causes for terminating the plaintiff's employment or were instead used as a camouflage for the fact that the plaintiff was fired because of his vocal criticism of IMH policies. It becomes necessary, therefore, to analyze, the defense.

An analysis of the testimony shows that the defendants could not clarify and substantiate their accusations. For example, as to the directive on overtime and staffing, the plaintiff argues it required him to give certain staffing levels and that he did comply with the administration's order. The Court cannot reject the plaintiff's position. What appears to be the defendants' real complaint is that the staffing patterns submitted by the plaintiff displeased Mr. Reidy and that it particularly aggravated him to receive this information from the plaintiff at a union meeting called for the very purpose of questioning reduction in staff.[3] The Court cannot fault Mr. Reidy for preferring a different time and place for the report; on the other hand, it may be Pilkington could not resist scoring a point be-

fore a partial audience, lest what he had to say might go undiscovered. This was indeed a quarrelsome way to act but a biting approach may at times be the most effective. As to the defendants' charge concerning overtime, that could hardly have catalyzed the discharge of the plaintiff, since the overtime in Pilkington's unit was not much different from that in other units.

Turning to the nursing schedules, the record shows the plaintiff corrected the problem and that it certainly had no significant weight in the evaluation of Mr. Pilkington. The same must be true as to alleged failure concerning preparation of admission forms. These were designed to verify census figures against separate admissions and discharge records and are not related to patient care. I credited the plaintiff's testimony that Dr. Bevilacqua and Hickey told him that tardiness in preparing these forms was not a factor in the decision to discharge him.

Finally, there is the testimony of Dr. Richardson, who was chairman of the accreditation committee. He stated that his main concern was Pilkington's negative attitude and his fear that it might be contagious. He also testified that he was troubled over the lack of organized procedures in the NRI unit and gave as an example the lack of a fire drill plan. This especially disturbed him he stated, because the plaintiff had led him to believe, in writing and verbally, that fire drill procedures were in effect. He also testified that when he visited the unit on March 15, no procedures for treatment teams existed. Further, the plaintiff failed to follow the requirements of an accreditation manual; at best he had completed only 15% of the manual's requirements, whereas other units had completed substantially higher percentages with at least two units attaining 80% compliance.

It is clear to this Court that the defendants' attitude toward record completion as the sine qua non for accreditation clashed

3. Cf. *Hannemann v. Breier*, 528 F.2d 750 (7th Cir. 1976) (disclosure of information to employees' association by employee).

with the plaintiff's first concern with patient care, to be accomplished in strict compliance with the various mental health codes. The Court cannot decide whether or not priorities were misplaced. It does find, however, that the plaintiff, while complying with them, challenged and questioned the wisdom of the priorities and directives. While Dr. Richardson had the right to demand completion of what he believed to be of first importance and for the long-range good of IMH, he could not immunize himself from criticism. But even if his priorities were correct, our inquiry must question the genuineness of the defendants' contention that it was the alleged deficiencies in Pilkington's performance that motivated the termination of his employment.

The Court cannot help but note that Dr. Richardson conceded in testimony that unitization was a chaotic process and that the time limitation he imposed to prepare for an accreditation inspection was unrealistic. He criticized Pilkington's management of the NRI unit, yet he was not very familiar with its inner workings. For example, he did not know of the lack of certain critical supplies. Richardson claims that Pilkington failed to comply with his directives, yet the evidence shows that his directives were not always clear and Pilkington's compliance was equivalent to other unit managers. A February 21 report on compliance with fire drill procedures demonstrates the point. There were discrepancies in the report which caused the plaintiff to request a meeting for clarification but this was not granted. Furthermore, the record indicates that the NRI unit was not more deficient in fire drill procedures than any other unit; indeed, Dr. Richardson himself could not recall ever having a fire drill when at one time he served as program manager for the adolescent unit. It is disturbing to see that Dr. Richardson reported to the committee meeting on March 31 that the plaintiff was told twice to submit a report as to the status of his unit but failed both times to comply; whereas, a report had in fact been

submitted which showed 73% compliance with accreditation requirements. Richardson's criticism of the NRI unit's handling of treatment teams was misplaced in that, by his own admission, decisions regarding treatment teams are a medical concern and that an administrator like Pilkington is limited in his power to affect such matters. And finally, there is Dr. Richardson's outright admission that the plaintiff's performance is [4] presently "good" on a scale of "excellent", "good", "fair", "less than fair but acceptable", "unsatisfactory". This is a high rating for a man they claim was fired for incompetence.

■ The evidence refuted the defendant's contention that plaintiff was fired for his inability or unwillingness to perform his job, and instead showed convincingly that the particulars cited by the defendants to support his discharge were either trivial, unequally applied (e. g., fire drills), not considered by the defendants themselves to provide a basis for discharge (e. g., tardiness in preparing admission forms), or simply not proved (that plaintiff refused to follow any clearly established policies or procedures.)

Having seen the witnesses and reviewed the testimony, the Court must conclude that it was not Mr. Pilkington's work but rather his critical and questioning voice that prompted his firing.

*Conclusions of Law*

Plaintiff concedes that state law affords no basis for a finding that his Fourteenth Amendment rights were violated by denial of a hearing and discharge without notice of any valid reasons. *Cf. Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). But he strongly presses his claim that he was discharged for engaging in activity protected by the First and Fourteenth Amendments to the Constitution, and that the discharge was therefore impermissible under *Pickering v. Board of Educa-*

---

4. Pilkington was restored to his job pursuant to a preliminary injunction of this Court and continues to work.

*tion,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ The Supreme Court has set forth in *Mt. Healthy* the manner in which such a claim must be established. Plaintiff has the initial burden of establishing that his activity, which is protected by the First Amendment, was a "substantial" or "motivating" factor in the defendants' decision to discharge him. If he meets that burden, he prevails unless the defendants show by a preponderance of the evidence that they would have reached the same decision to discharge "even in the absence of the protected conduct". 429 U.S. at 287, 97 S.Ct. at 576.

■ The threshold question is whether or not plaintiff has established that he engaged in activity, for which he was discharged, which is protected by the First Amendment. Because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general", resolution of the First Amendment question must depend on the particular facts of each case. It requires balancing of the interests of the employee as citizen, in commenting on matters of public concern, and the interests of the state as employer, in the efficiency of the public service. *Pickering v. Bd. of Ed.,* 391 U.S. at 568, 88 S.Ct. 1731, 1734.

■ The Court in *Pickering* laid down certain guidelines to assist lower courts in analyzing such cases. In general, where the employee's critical comments on matters of public concern are "substantially correct", they cannot furnish ground for dismissal. *Id.* at 570, 88 S.Ct. 1731. The Court excepted from this general rule cases where there is a demonstrated need for confidentiality, or where the relationship between superior and subordinate is of such

a personal and intimate nature that "certain forms of public criticism" would "seriously undermine the effectiveness of the working relationship", *id.* at 570 n. 3, 88 S.Ct. at 1735. The applicability of these exceptions to this case will be considered *infra.*

■ The Court held, as to statements of public concern that are found to be false,[5] that the state-employer has no greater power to limit the false statements of an employee than the truthful statements unless it can show that the employee's activities impeded the proper performance of his daily duties or interfered with the regular operation of his governmental bureau.

> What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public. *Id.* at 572–573, 88 S.Ct. at 1737 (footnote omitted).

The Court cautioned against any attempt to find that criticism of a public employer is *per se* detrimental to the public service. *Id.* at 572–573, 88 S.Ct. 1731. Moreover, the fact that adverse criticism by an employee has a detrimental impact upon individual administrators is not enough. Dismissal based on substantially false adverse criticism must be supported by a showing that the employee's statements either interfered with the employee's performance of his duties, jeopardized his relationship with his fellow workers, or actually disrupted the

---

5. But as to statements which were knowingly or recklessly false, the Court reserved decision, 391 U.S. at 574, 88 S.Ct. 1731.

operation of the sector of government which employed him. *Gieringer v. Center School District No. 58*, 477 F.2d 1164–1166, 1167 (8th Cir. 1973), *cert. denied*, 414 U.S. 832, 94 S.Ct. 165, 38 L.Ed.2d 66; *see also Bertot v. School District No. 1*, 522 F.2d 1171 (1st Cir. 1975) (discharge overturned where no showing that criticism interfered with employee's duties or school operation); *Nebraska Dept. of Roads Emp. Assoc. v. Dept. of Roads*, 364 F.Supp. 251 (D.Neb. 1973); *Roberts v. Lake Central School Corp.*, 317 F.Supp. 63, 65 (N.D.Ind.1970) (oversensitivity of superiors to criticism no basis for finding criticism detrimental to state interests).

The Court has found, after examining the exhibits in this case and weighing the extensive testimony by various witnesses, that the defendants were motivated to discharge Mr. Pilkington by reason of his utilization of a variety of administrative channels to air grievances, make suggestions and identify deficiencies. In particular, the Court finds that defendants were motivated by the SRS letter he had written (see p. 470 *supra* ); his questioning and criticism of the merits of the crash pre-accreditation program (although he nevertheless fully participated in it); his criticism of the failure of central administration to provide supplies and repair crews necessary to maintain patient care in the NRI; his protest of the attitude and conduct of central administration regarding the statutory requirements of the Mental Health Law [6] and the accreditation process; his protest and request for reconsideration of central administrative decisions regarding reductions in staffing levels at NRI and continued admissions into NRI; his statement that he would call in the press if conditions were not improved; his refusal to prevent a subordinate from reporting conditions to her congressman or Dr. Bevilacqua; and finally his testimony on behalf of a patient at a certification hearing.[7] These were the substantial factors on which his discharge was undertaken.

These activities, which include letter-writing to a superior, speaking, and testifying in court are within the ambit of the protection of the First Amendment. *Pickering, supra; Gieringer v. Center School District, supra; Bertot v. School District No. 1, supra; Russo v. Central School District No. 1*, 469 F.2d 623 (2d Cir. 1972), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1899, 36 L.Ed.2d 391. The plaintiff addressed the difficulties of unitization (which the defendants describe as an important matter of public concern and one requiring discussion), the difficulties the IMH was having in complying with state law, and the requirements of patient care at a time when IMH was undergoing major, publicized changes and was seeking accreditation. The public has a legitimate interest in the way public monies are spent, the compliance of agencies with state law and the care of mental patients in state facilities. *Cf. New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Welsh*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

First Amendment interests in truth-seeking and robust public debate were especially furthered because the plaintiff, as an expert in his field and unit manager, was especially well qualified to speak out. *Pickering* recognized that it is "essential" that those public officials who are most informed about a matter of public importance by virtue of their involvement with it "be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1736.

Pilkington spoke out on matters of public concern and each of his criticisms would have been appropriate for expression in some public forum. But he did not choose first to speak in public. Certainly his criticisms do not lose the protection of the First Amendment by reason of their

---

**6.** Rhode Island General Laws c. 40.1 (1976), *see* especially c. 40.1–5.

**7.** *Cf. Crawford v. Short*, 387 F.Supp. 282 (S.D. Tex.1975) (employer disapproval of employee testimony).

being prudently directed to his co-employees and superiors inside the IMH instead of to the public at large. Absent special considerations not present here, the truth-seeking values protected by the First Amendment apply to criticism of government inside its halls as well as in the letters to the editor column. Indeed, the *Pickering* Court suggested that there may be situations where an employee has a duty to bring his criticism to the attention of his superiors before making it available to the public at large. *Id.* at 572 n.4, 88 S.Ct. 1731. While the Court need not decide whether or not Mr. Pilkington had such a duty, it seems apparent that he did not, by his prudence, forfeit the protection his criticism would have had had he first trumpeted it to the local newspaper. *Compare Gieringer v. Center School District, supra.*

▆ Some courts have made the forum used for the expression of opinions a salient, even crucial, determinant of the extent of First Amendment protection. Expressions in public forums about matters of public interest are protected; expressions in private to co-workers or superiors may not be. *See Roseman v. Indiana U. of Penn. at Indiana,* 520 F.2d 1364, 1368 (3rd Cir. 1975), cert. denied, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (private communication receives less protection than public forum communication); *Sprague v. Fitzpatrick,* 412 F.Supp. 910 (E.D.Pa.1976), aff'd, 546 F.2d 560 (3rd Cir. 1976). The logic of this position is that the employee's rights to free expression are the rights of any member of the public. While his employment with the state may constrict those rights, it does not add to or alter them. Since the general public lacks private access to agency personnel, communication by the public through such private channels is not specially guaranteed; therefor such communication by employees will not be protected either. But this too formal logic, by placing a premium on public disclosure, undermines the agency loyalty and smooth-functioning

which the caveats in *Pickering* sought to protect. Indeed, often it is not the disagreement or criticism but the fact of disclosure in a public forum which makes for that appearance of insubordination so intolerable to some heads of organizations. *Cf. Meehan v. Macy,* 129 U.S.App.D.C. 217, 392 F.2d 822, modified 138 U.S.App.D.C. 38, 425 F.2d 469 (1968), aff'd en banc, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969).

An employee's use of a public forum may, however, demonstrate the protected nature of the speech and serve as an *indicium* that the matter is one of public concern and therefore protected. Thus, the *Roseman* "public forum test" is really one of several tests of public interest or relevance and is designed to further one of the interests which *Pickering* sought to protect: to foster a full and knowledgeable debate of public matters. However, this court must make its own determination of whether subject matter is of public interest and therefore deserving of protection. It cannot rest with merely observing where the speech happened to occur.

The *Roseman* court also tried to further with its "public forum test" a second interest which *Pickering* sought to protect: the employer's interest in a smooth, functional operation. *See Sprague v. Fitzpatrick,* 546 F.2d 560.[8] Debate in public forums is distant from the direct confrontation of ideas and personalities among co-workers. Debate in the public eye tends toward the abstract, the rational and the principled whereas debates within an agency over policies and ideas may be interlaced with clashes of personality and tempers may flare face to face. When *Roseman* protects speech in public forums it may be protecting only that speech which is cooler and less disruptive of orderly work. But all intra-agency expression is not disruptive. A court should not substitute so imprecise a test for the one the Supreme Court laid down: does the speech (if false) interfere

---

**8.** In *Sprague*, the Third Circuit expands on its concern with disruptiveness in the context of criticism leveled by an employee in a personal, intimate, and confidential relationship with his

employer; such a relationship was excepted from *Pickering's* general rule protecting truthful statements.

with the agency's functioning or the speaker's performance of his duties?

These policy reflections merely buttress what is obvious. Mr. Pilkington can not be deprived of constitutional protection because he voiced from within matters that were entirely appropriate for public discussion and of current public interest.

Because the defendants vehemently deny that the plaintiff was discharged for voicing criticisms of his superiors, the Court is at a loss to understand the import of their argument that his discharge was permissible because he was a high policy-making employee from whom the need for personal loyalty and confidence was so great that he could permissibly be terminated for truthful statements which would, if voiced by lesser employees, be protected by the First Amendment. For unless he actually did engage in arguably protected activity, his policy-making status is of no concern. Nonetheless, the testimony and exhibits showed quite clearly that the position held by Mr. Pilkington was not the type of position which the Supreme Court excepted from the general *Pickering* guidelines, 391 U.S. at 570 n.3, 88 S.Ct. 1731. The record demonstrated a sharp division of authority between IMH unit personnel, including plaintiff, and IMH central administration, including defendants. Defendant Angelini himself noted that plaintiff was not in a policy-making position, but rather had the duty to implement internally and externally imposed hospital policies. Nor did the defendants enjoy a "close working relationship" with plaintiff, or prove that plaintiff's position required extra-ordinary intimacy or confidentiality with his superiors. *Compare Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. 1731; *Gould v. Walker*, 356 F.Supp. 421 (N.D.Ill.1973) (assistant to Governor and director of cabinet-level office held to be confidential employee); *Jaffree v. Scott*, 372 F.Supp. 264 (N.D.Ill.1974), *aff'd in part mem.*, 519 F.2d 1405 (7th Cir. 1974) (assist-

ant attorney general); *cf. Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (patronage dismissals). To the contrary, the defendants agree that plaintiff and other program managers were expected to be "outspoken".

Further, the evidence convinced the Court that the plaintiff complied with clear orders given him, and limited his complaints and criticisms to proper channels not calculated to impede the functioning of the IMH. His advocacy of patients' interests and compliance with the requirements of state law were, instead, fully consonant with his continuing satisfactory performance. In fact, much evidence showed that he improved staff morale and patient treatment.

Finally, the Court is cognizant that it must tread especially warily where, as here, the state as employer is operating a mental hospital and the potential ramifications of management disputes and intra-agency warfare are serious indeed. This would be a far different case had plaintiff led his co-workers out on strike, or engaged the patients in a holy battle against the forces of bureaucracy. But at no time did the plaintiff's actions disrupt hospital care or interfere with the calm and protected environment which might be thought advisable in a mental hospital.

Administrators cannot bar the First Amendment at the door of a mental hospital by exaggerated claims that criticism creates an anti-therapeutic environment. In *Commonwealth of Pennsylvania ex rel. Rafferty v. Philadelphia Psychiatric Center*, 356 F.Supp. 500 (E.D.Pa.1973), while clearly sensitive to the special nature of mental hospitals, the court nevertheless reinstated a psychiatric nurse who had been fired for criticizing, in a newspaper interview, the conditions of treatment where she worked and for alleging sexual and drug abuse of patients.[9] In *Donahue v. Staunton*, 471

---

**9.** [T]here was no credible testimony . . . that publication of the article and the staff's consequent anxiety would adversely affect patient care. . . . Nor was it demonstrated that [plaintiff's] statements had destroyed staff

harmony and discipline . . . . If defendants and their staff were upset . . . . . [T]heir anxiety was caused . . . by their proximity to a person who was engaging in precisely the sort of free and vigorous expression that

F.2d 475 (7th Cir. 1972), *cert. denied* 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687, the court awarded damages for violation of First Amendment rights to a Catholic chaplain who had been dismissed from his post in a mental hospital. During a time of rapid and disorganized change in the hospital, he had criticized, in articles, advertisements and speeches, the lack of supervision of patients and resulting sexual and drug activities. Compared to such vocal criticisms, plaintiff Pilkington appears restrained.

The Court has found that Mr. Pilkington was discharged for airing his grievances and criticism. *Pickering* teaches that statements of grievance, if true, cannot provide the basis for a permissible discharge and that, if false, justify discharge only if they impede the conduct of plaintiff's job or the work of his agency. On the record before the Court, it appears that each of Mr. Pilkington's statements of criticism was substantially correct. The defendants have shown none of them to be false; nor was it even suggested that they were "knowingly false or recklessly made". *Pickering*, 391 U.S. at 574, 88 S.Ct. 1731. Because the statements were substantially true and, assuming *arguendo* that they were false, no impeding of agency functioning was shown, the Court finds that, on balance, the First Amendment protects Mr. Pilkington's various criticisms and expressions of opinion. Therefore, the plaintiff has proved enough to entitle him to reinstatement.

■ *Mt. Healthy* dictates that this Court next consider whether the defendants

the First Amendment was designed to protect.
. . .

The First Amendment does not stop at the hospital door. A hospital should be given every possible latitude in maintaining a proper environment for the treatment of its patients. It may not, however, be permitted to mask its arbitrary suppression of protected speech behind claims that such speech creates an "anti-therapeutic situation" when no ill effect on patient care has been shown. It may not stifle one employee's freedom of expression by professing a duty to create a sterilized, anxiety-free vacuum for its other employees . .

have proved by a preponderance of the evidence that they would have discharged the plaintiff even in the absence of the protected activity. They have not done so. The various factors which defendants claim to have relied on in terminating the plaintiff were not supported by the evidence. In fact, the evidence showed, rather convincingly, that these were but pretexts for the discharge. (*See, supra*, pp. 471–472.)

Plaintiff's case gains added strength from the fact that the discharge here was not, as are many teacher discharges, made at a time when a number of personnel decisions had to be made. *Cf. Mt. Healthy*, 429 U.S. at 282, 97 S.Ct. 568. In *Mt. Healthy*, as in the typical non-tenured teacher-discharge case, discharge and tenure decisions must be made at a particular time for all non-tenured teachers, and it will rarely appear that the contract non-renewal decision was precipitated by the exercise of protected activity. Here, on the other hand, as plaintiff points out, the discharge decision did not occur in the normal course of business; no other program managers were evaluated at the same time and no objective criteria were employed.

In summary, the Court finds that plaintiff engaged in activity protected by the First Amendment, taking into account his own interests and the interests of the state as his employer; that this activity was the motivating factor in his discharge; and that the defendants would not have discharged plaintiff in the absence of this protected activity. The Court orders that plaintiff be reinstated in his position.[10]

*Com. of Penn. ex rel. Rafferty v. Phila. Psychiatric Center*, 356 F.Supp. 500, 508 (E.D.Pa. 1973).

10. This decision is entirely consistent with the recent decision of *Rosado v. Santiago*, 562 F.2d 114 (1st Cir. 1977), which extended First Amendment protection to a social worker who wrote an internal-agency letter which criticized "irregularities" in the administrative procedures of the food-stamp program in which he worked. He sent the letter to his immediate supervisor and to other superiors including the Secretary of Social Services in San Juan, to whom he later expressed his views, face to face. Noting that the letter was circulated to a

■ Because plaintiff has been maintaining his position by reason of a temporary order issued by the Court, he has been able to prove no damages. Although the Court would be empowered to award nominal damages, it is not disposed to do so, reasoning that reinstatement is a complete remedy in this case. *Cf. Rosado v. Santiago*, 562 F.2d 114, 119–122 (1st Cir. 1977). For this reason, even if plaintiff prevailed on his claims arising under state law, no damages have been shown; none can therefore be awarded. Costs will be taxed against the defendants. Plaintiff is entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988 (1976).

■ Plaintiff shall prepare an order in conformance with this opinion, endorsed as to form by the defendants.[11]

number of members of the agency and that the Secretary feared that it would fall into the hands of the press, the First Circuit found First Amendment protection of it; the Court felt no need to decide "whether a purely private letter to one's superior" is similarly protected, *id.* at 117. The Court also noted that the letter breached no "strong need for confidentiality" regarding the agency, that the letter did not cause a "significant interference with the efficient operation of the department", and that it did not launch a "personal attack upon his superiors or co-workers" which would significantly interfere with efficiency. *Id.*

The case at hand is clearly within the factual pattern of *Rosado.* The plaintiff's statements were generally circulated within his agency, were susceptible of media interest, did not disrupt the administration of other mental health units or NRI, and were principled criticisms not personal attacks.

11. Reflection on this case leads me to believe that a separate ground of decision exists, or rather should exist, for deciding this case. *Pickering* addresses the person who speaks out on a matter of general concern. The plaintiff in that case chose the letter to the editors column as his first forum to make several doubtful accusations. As could any member of the public, so he could write such a letter and the government without a specific and justified reason could not condition his employment on surrendering that right.

A different sort of right to speak exists—should exist—among those who work in the same place and for the same organization. The right is not common to all citizens, but arises from participation in a common enterprise; just as all citizens, common members of this democracy, have a right to participate and speak on matters of common importance. Many matters of great import to the daily work of an agency might not qualify as matters of general concern or public record but are important to the vital and accurate functioning of an agency.

Pilkington's First Amendment rights to speak freely and petition his government surely include his right *qua employee* not *qua citizen* to participate and express his opinions in his place of work without fear of reprisal—so long, of course, as he also follows the directives of his superiors.

This is a step beyond the facts of *Pickering* but not beyond the values which *Pickering* teaches and the interests which it protects. For *Pickering* furthers truth-seeking and protects the contribution which those who work, day in and day out, in the public service can make. Under *Pickering* the employee who makes a truthful, telling, public criticism which in fact disrupts business-as-usual may not be discharged (unless he or she occupies some special position of confidence). Only the false statement which disrupts may justify discharge. Truthful debate, not unquestioning obedience or fearful submission should reign.

Reflection on this case demonstrates that to assure the protection of the First Amendment in those everyday contexts which matter most, some consideration must be afforded to the employee who, while not vociferous in public, does seek by voicing his opinion to participate in the work and decisions of his agency. See T. Emerson, *The System of Freedom of Expression* (1970) at 570–81.

Bureaucracies tend toward rigidity and strive for secrecy to protect from outside scrutiny. They, too, are in need of the robust and vigorous and wide open debate which the First Amendment assures the political arena, for such debate allows for revitalization through participation.

The few courts which have considered cases which raise this problem on their facts have not been sympathetic. *See Roseman, supra; Spraque v. Fitzpatrick, supra. Cf. Lefcourt v. Legal Aid Society*, 312 F.Supp. 1105, 1113 (S.D. N.Y.1970), aff'd 445 F.2d 1150 (2nd Cir. 1971). In balancing the interests of the individual in speaking against the interests of the state employer in maintaining discipline and control such cases have favored the interests of the employer. Presumably the public interest in free and robust discussion has not been deemed sufficient to tip the balance and this despite the fact that *Pickering* protects truthful though disruptive criticism.

We can look to a case like *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) to begin to find support for a balance which favors the employee's rights of speech and participation over hierarchical discipline. In *LaFleur* we find the Court mandating what amounts to a participatory

process between employee and employer by which the two are to reach a solution fair to both in an important personal and personnel decision, namely the period of time a pregnant teacher may teach. Efficiency may not prevail over the rights of an employee to participate (perhaps face to face) in this work decision of vital importance to her. Tribe, "Structural Due Process", 10 Harv.Civ.Rts.Civ.Lib.L.Rev. 269 (1975) (explores the values of participation immanent in certain Supreme Court decisions). Some decisions concerning the freedom of speech between workers and employers, *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); *McLaughlin v. Tilendis*, 398 F.2d 287 (7th Cir. 1968) (First Amendment forbids dismissal of teacher solely for membership in teachers' union); *Hannemann v. Breier*, 528 F.2d 750 (7th Cir. 1976) (policemen's right to speak out on a matter of direct concern to employment relationship with their Department protected despite their limited breach of disciplinary rules by disclosure of a confidence); *Cf. Republic Aviation Corp. v. N.L.R.B.*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *International Ass'n of Mach. & Aerospace Workers v. Natl. Mediation Bd.*, 138 U.S. App.D.C. 96, 425 F.2d 527, 536–37 (1970); and between employees and their union, *see, Fulton Lodge No. 2 of Int. Ass'n of Machinists & Aerospace Workers v. Nix*, 415 F.2d 212 (5th Cir. 1969), *cert. denied*, 406 U.S. 946, 92 S.Ct. 2044, 32 L.Ed.2d 332, have protected speech even at the expense of efficiency and organizational discipline.

These cases protect speech concerning the economic relationship of worker and employer and their collective bargaining. But the speech of employees concerning the work of their organization and its methods has not received much attention. Is it too much to recognize, for example, that members of a profession have, as a matter of conscience, commitments to standards and philosophies of practice; and that, at least without clear agency rules to the contrary, they may not be disciplined for expressing the dictates of their professional conscience? Thus, Judge Wyzanski recognized that where a teacher utilizes a particular teaching method which has some professional support and involves a matter of free speech, he cannot be suspended absent a clear school rule prohibiting his methods. *Mailloux v. Kiley*, 323 F.Supp. 1387 (D.Mass.1971), aff'd, 448 F.2d 1242 (1st Cir. 1971).

These tenuous strands do not yet demarcate a new aspect of First Amendment law. They are suggestive only; Pilkington's plight concretizes the matter. A man of long experience with commitments to professional standards and to the patients, whose suffering was his charge, should be free—for his own dignity and professional self-respect and for the good of mental health care in this state—to speak to his co-workers and superiors on matters which affect them jointly and their common enterprise at work.

I must emphasize again that Mr. Pilkington's right to reinstatement in this case derives directly from *Pickering* and *Mt. Healthy* and from the right of employees as citizens to address matters of public interest or import.