Vincent R. **DUFFY**, Paul W. **Breault** and Robert C. **Litchfield**

v.

Brian J. **SARAULT**, individually and in his capacity as Mayor of the City of Pawtucket, et al.

Civ. A. No. 88–0394.

United States District Court, D. Rhode Island.

Dec. 22, 1988.

Thomas J. Liguori, Jr., Urso, Liguori & Urso, Westerly, R.I., for plaintiffs.

Thomas J. McAndrew, Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Plaintiffs are Paul Breault and Vincent Duffy, former employees of the City of Pawtucket. Robert Litchfield, also a former employee, has withdrawn as Plaintiff from this action because, with the assistance of the Defendant Brian Sarault, now · mayor of the City of Pawtucket, he has obtained employment with the State of Rhode Island.

Mr. Breault is a long time political ally of Henry Kinch, who from 1981 until 1987 was Mayor of the City of Pawtucket. When Mayor Kinch declined to seek re-election in 1987, Defendant Brian Sarault, then a City Council member and a vigorous Kinch opponent, was elected mayor. Beginning his political affiliation in 1969, Mr. Breault was a close advisor and strategist for Mayor Kinch in his campaign in 1981 and later campaigns. Mr. Breault has a Bachelor's Degree in economics from the University of Rhode Island as well as an additional twelve hours of college credit in accounting. In 1982, Mayor Kinch appointed Mr. Breault the City Clerk, an unclassified position. After three years as City Clerk, Mr. Breault became Director of the Department of Parks and Recreation for the City of Pawtucket, a classified position. A classified employee may be discharged only for cause.

After approximately three and a half years as Director, Mr. Breault was notified on June 14, 1988 by letter that his position had been eliminated because of a reorganization of operations. The notice was given to him by his immediate superior Eugene Jeffers, who was Director of the Department of Public Works for the City of Pawtucket.

Prior to the reorganization, the Department of Parks and Recreation contained two subdivisions, one having to do with recreational activities and the other having to do with maintenance of the City's parks and recreational facilities. There was a person in charge of each of these activities who reported to Mr. Breault. The reorganization eliminated the Director's position, but split the department into two sections, headed by a Superintendent of Parks and a Superintendent of Recreation. The result was that the same work was divided among the two superintendents and, indeed, after the reorganization the same work was performed by the same persons. Mr. Breault applied for several vacant positions, including the Superintendent of Recreation, Superintendent of Parks, Superintendent of Public Works Operations, and Assessor. He received no interview with respect to the Superintendent of Recreation's position; he had interviews with respect to the other positions but was not offered a slot. Mr. Breault, as a Director, was at pay grade 15 for which he received $37,100 per year. The Superintendent of Park's position paid something more than $29,000 per year.

In June 1988, Mr. Duffy was the City's Assistant Director of Public Works and had been so for two and a half years. During the time that he was in the classified service as Assistant Director of Public Works he was not politically active. In the past, however, he had been Mayor Kinch's campaign chairman and also acted as treasurer of Kinch's campaign. He has an Associate's Degree in Business Management from Johnson & Wales College and a Bachelor of Arts Degree from Rhode Island College. On June 14, 1988, Mr. Duffy also received a letter notifying him that because of the reorganization his position had been eliminated. Mr. Jeffers delivered that notice.

The requirements for the newly created position of Supervisor of Public Works Operations, which proximated the job responsibilities of Mr. Duffy's position as Assistant Director of Public Works, included a ten year experience requirement. Because Mr. Duffy did not have ten years experience he was not eligible for that position.

The reorganization plan went through several stages. First, a Management Task Force studied the City's operations. The committee was a volunteer effort of nine public spirited citizens, the majority of whom were selected by Mr. Baptista, the chairman of that advisory committee. His selections were made with assistance from the Blackstone Valley Chamber of Commerce. Mr. Baptista testified that the Task Force had five meetings before June 9, 1988, that the Department of Public Works was the subject of a lengthy discussion of one hour and a half on May 5, 1988, and that he met on May 5, 1988 with Mr. Jeffers, the Sarault administration's Director of the Department of Public Works. He relied on Mr. Jeffers and other people on the Management Task Force who had more experience. The Task Force prepared

a preliminary report which suggested that certain positions be abolished, including the Assistant Director of Public Works.

The reorganization was voted on June 13, 1988 by the Personnel Board of the City. There is no record of a consideration of reorganization by the Personnel Board from January 6, 1988 until the action taken on June 13, 1988. The Board is composed of five members, who are appointed by the Mayor with the approval of the City Council. Two members were appointed by Mayor Sarault, two by former Mayor Kinch, and one by former Mayor Lynch. The Personnel Board was unanimous in adopting the reorganization which became effective July 1, 1988.

After the reorganization's adoption fourteen people were notified of their termination. However, of the fourteen, two persons retired and only four others are no longer City employees, including the three persons who were Plaintiffs in this case and a part-time nurse who worked in the community medical services unit. The reorganization resulted in a savings of $123,000.

There was no complaint filed by the Plaintiffs in this action under the provisions of the City's Personnel Rules and Regulations.

Mr. Jeffers had been Director of the Public Works from the beginning of the Sarault administration in January 1988. He worked for the City of Pawtucket from 1966 to 1985, thus meeting the ten year experience requirement. Mr. Jeffers is a civil engineer, a graduate of Manhattan College, and also did graduate work in engineering. He served as Public Works Director for the Town of Cumberland, Rhode Island, and had previously served as engineer for Pawtucket and the New York City Department of Public Works. He actively supported Mr. Sarault and was aware that the Plaintiffs were Kinch supporters.

The Department of Public Works has 189 employees. The recommended changes involved abolishing thirteen positions and establishing seven positions. According to Jeffers, the reorganization was long overdue and he denied that the fact the Plaintiffs were Kinch supporters had anything to do with the action.

Mr. Jeffers testified that the choice to fill the newly created Superintendent of Parks was among three persons. Mr. Jeffers made the choice and picked Mr. Kolczycki, who apparently scored highest in the test. He had known him when he had worked for the City as Assistant Director of Parks and Recreation for a number of years. There was some discussion at the Management Task Force meeting of the ordinance which established the Assistant Director of Parks and Recreation position. According to Mr. Jeffers however, the Recreation Department had grown since 1972 and now had some forty-one City facilities to attend to as well as recreational activities.

Robert Litchfield, the former City Property Manager who had been a Plaintiff in this action, testified that Sarault's Administrative Assistant expressed surprise at Litchfield's surprise about the reorganization, stating "this happens to everybody in our business." Mr. Litchfield has a job with the State of Rhode Island at this time for which he was recommended by Mayor Sarault on the condition that he withdraw from this lawsuit.

Councilman Doyle, a Kinch supporter, testified that he was president of the City Council from 1981 to 1987 during the Kinch administration. He had a discussion with Mr. Jeffers on election evening at an establishment called "Hooligan's" on Central Avenue in Pawtucket at which time Mr. Jeffers said something to the effect that things are going to be different "once we get rid of the Byners and the Breaults." Byner was then City Solicitor.

The Council, under the Sarault administration, did not re-elect Mr. Doyle president of the City Council. Mr. Doyle told Mr. Breault of his conversation with Mr. Jeffers about two weeks afterwards. Mr. Jeffers denied ever having such a conversation.

The Plaintiffs claim that their positions were terminated because of their political affiliations with former Mayor Kinch, thereby violating their First Amendment

rights.[1] The Plaintiffs also contend that the Defendants deprived them of due process during the reorganization. Finally, the Plaintiffs claim that the Defendants' actions violated the Charter of the City of Pawtucket and Rhode Island's Open Meetings Law.

## FIRST AMENDMENT ISSUES

To prove a First Amendment violation, the Plaintiffs must first establish that their conduct which they allege was the factor behind the terminations was constitutionally protected. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The Plaintiffs' political associations with and on behalf of former Mayor Kinch are clearly constitutionally protected. This preliminary hurdle cleared, the Plaintiffs must then show that their conduct was a substantial or motivating factor in the Defendants' decision to terminate their employment. *Id.* Even if the Plaintiffs establish that, however, they will not recover if the Defendants can prove by a preponderance of the evidence that they would have terminated the Plaintiffs' employment even in the absence of the protected conduct. *Id.*

Direct evidence of retaliatory firings is rare; facts in these cases must often be inferred from the evidence. In this case, the Plaintiffs' strongest evidence is the effect of the reorganization. Of the fourteen employees terminated, eight were ultimately rehired,[2] two retired, and four were not rehired. The four former employees who were not rehired were the three Kinch supporters, Duffy, Breault, and Litchfield, and one part-time nurse. The result is somewhat suspicious given the acrimony that exists between the Kinch and Sarault camps.

Additional testimony supports the conclusion that the reorganization's peculiarly disproportionate impact on Kinch supporters was not mere coincidence. Councilman Doyle testified that Jeffers stated that the Sarault administration wanted to "get rid of" Breault. Mr. Litchfield testified that Mayor Sarault's Administrative Assistant commented that "this happens to everyone in our business," the implication being that the Plaintiffs' employment status was subject to shifting political fortunes. There was also testimony that in a 1985 debate, then-Councilman Sarault stated that he wanted to replace the Assistant Deputy of Public Works, a Kinch treasurer. Accordingly, the Court finds that the Plaintiffs' political affiliations were substantial factors in the Defendants' decision to reorganize the Department of Public Works.

The focus therefore shifts to the Defendants to prove by a preponderance of the evidence that they would have reorganized in a similar manner even in the absence of Plaintiffs' political affiliations. A public employer is not prohibited from reorganizing its operations so as to eliminate unnecessary positions and expenses. *Joslyn v. Kinch*, 613 F.Supp. 1168, 1176 (D.R.I.1985) (*citing Landry v. Farmer*, 564 F.Supp. 598, 606 (D.R.I.1983)). Although the Plaintiffs' political activities were an impermissible factor in the reorganization decision, the Defendants have met their burden of establishing that the reorganization would have nevertheless occurred in a similar manner even if constitutionally impermissible factors had not been considered.

First, the City's operations, although restructured as recently as 1984, *see id.* at 1171–72, were again ripe for reorganization. The savings of $123,000 supports the conclusion that the operations could be run more inexpensively, if not more efficiently.

---

1. The Plaintiffs also claim that a termination from a classified position for political reasons violates the City Personnel Rules and Regulations. This will be considered in conjunction with their First Amendment claims. *See infra* note 3.

  The word "termination" is usually understood to mean the discontinuation of employment. *See, e.g., Webster's Ninth Collegiate Dictionary*

1217 (1983) (to terminate is "to discontinue the employment of"); *Black's Law Dictionary* 1319 (5th ed. 1979) (to terminate is "to put an end to"). Termination thus encompasses both discharges and layoffs, each of which has very different legal ramifications. *See* text *infra*.

2. The evidence does not indicate the employees' new positions and salary change, if any.

Thus, considerations other than the Plaintiffs' political activities provided some impetus for the reorganization.

Second, the reorganization was supported by two relatively impartial bodies: the Management Task Force and the Personnel Board. The Task Force, headed by Mr. Baptista, had no political ax to grind. Composed of nine members the majority of whom Mr. Baptista selected with the assistance of the Blackstone Valley Chamber of Commerce, the Task Force did not know who held the positions under review. Yet the Task Force recommended the abolition of the Assistant Director of Public Works position.

The Personnel Board likewise adopted the reorganization plan. The Board, which was unanimous in its conclusion, consisted of two Sarault appointees, two Kinch appointees, and one Lynch appointee. The inference to be drawn is that were the reorganization merely a political retaliation, at least one of the Kinch appointees would have registered some discontent.

█ The fact that the elimination of the Plaintiffs' position was made during the course of an extensive reorganization also adds weight to the Defendants' argument that the reorganization would have occurred regardless of the Plaintiffs' activities. *Compare id.* at 1176 (termination occurring during active reorganization of City's government) *with Pilkington v. Bevilacqua,* 439 F.Supp. 465, 477 (D.R.I.1977), *aff'd,* 590 F.2d 386 (1st Cir.1979) (termination occurring when no other programs were being evaluated). Moreover, the evidence shows that the Plaintiffs were not discriminated against on the basis of political affiliation in the rehiring process. Mr. Breault was not hired for the Superintend-

ent of Parks position because a more qualified candidate, Mr. Kolczycki, applied. Mr. Duffy did not qualify for the Assistant Director of Public Works position because he lacked the required ten years experience. Although the requirement of ten years experience might inferentially suggest a basis to exclude Mr. Duffy, it can hardly be said to be an artificial requirement unconnected with expected job performance. The Court concludes therefore that the Defendants have proven by a preponderance of the evidence that the Plaintiffs' would not still retain their former positions "but for" their political affiliations.[3]

## DUE PROCESS

Plaintiffs also complain that they did not receive the requisite degree of due process during the City's reorganization. Specifically, Plaintiffs state that they received no notice of nor had any opportunity to address the Personnel Board's meeting of June 13, 1988.

█ The Fourteenth Amendment's due process clause provides that a person may not be deprived of property without due process of law. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). To establish a due process violation, Plaintiffs must first show that they had a property interest in continued employment; a unilateral expectation will not suffice. *See Joslyn,* 613 F.Supp. at 1178. Because Plaintiffs were classified employees who could be dismissed only for cause, they did in fact have a property interest in continued employment. *Id.* at 1178 (citing *Durkin v. Personnel Bd.,* 83 R.I. 353, 356, 116 A.2d 456, 457 (1955)).[4]

---

**3.** This conclusion, however, does not necessarily resolve whether the Defendants violated the Personnel Rules and Regulations for the City of Pawtucket which prohibit dismissing or demoting a classified employees for political reasons. Rule XVI, Section 1 states that no person shall *"in any way ... discriminate"* [emphasis added] against classified employees because of their political activity. The plain language that prohibits political discrimination *"in any way"* makes it unclear whether the *Mt. Healthy* "but for" analysis is applicable. Nevertheless, the

Court need not address that issue because the Plaintiffs, by failing to appeal the reorganization decision to the Personnel Board or the Personnel Director as Rule III, Section 7 requires, did not exhaust the administrative remedies available. *See Illinois Commerce Comm'n v. Thomson,* 318 U.S. 675, 686, 63 S.Ct. 834, 839, 87 L.Ed. 1075 (1943).

**4.** Property interests do not stem from the Constitution; rather, they are a product of state law. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S.

Existence of such a property right, however, does not necessarily confer upon the Plaintiffs the full panoply of procedural safeguards. The Supreme Court has noted that due process is a flexible concept and its boundaries depend upon the particular situation. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The question here is what process is due when the positions in which the Plaintiffs had a property interest no longer exist.

The resolution turns on the nature of the Plaintiffs' property right. Their interest in continued employment "did not grant [them] a legitimate claim of entitlement to the ... position[s] in perpetuity; at best, it gave [them] a property interest in the job[s] so long as the job[s] existed." *Hartman v. City of Providence,* 636 F.Supp. 1395, 1408 (D.R.I.1986). In light of this, the distinctions between "dismissed" or "discharged" and "layoff" or "abolishment" become crucial. *See id.* at 1409–10 (discussing difference between removal from a position and abolishment of position).

█ Had the Plaintiffs been discharged for any reason, due process would have required that they receive notice of the alleged basis and a meaningful opportunity to respond. *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493. The Plaintiffs, however, were not discharged, as that term is normally understood. *See Hartman,* 636 F.Supp. at 1409 (discharge or dismissal "connotes an action predicated upon some personal attribute of the employee"). Rather, they were laid off during the course of a reorganization; their positions were abolished.[5] The Plaintiffs received notice of the Personnel Board's actions the following day. A pre-termination hearing in this situation "would have been an idle exercise" and the Plaintiffs were not entitled to one. *Id.* at 1418. Under the City's Personnel Rules and Regulations, Rule III, Section 7, the Plaintiffs had the right to appeal the Board's actions to either the Board or the Personnel Director. The Plaintiffs chose not to do so. Accordingly, the Plaintiffs have failed to establish a procedural due process violation.[6]

## CITY CHARTER

The Plaintiffs next allege that the City's reorganization violated two provisions of the City's Charter. Section 7–104(19) of the Charter provides that the City may discharge or demote a person only after the City has given that person the reasons for the action and an opportunity to respond. Section 7–101 of the Charter states that the City may dismiss or demote classified employees only for cause.

As mentioned above, the Plaintiffs were not discharged or demoted; rather, their positions were abolished. To conclude that no distinction exists between dismissal and abolishment would effectively handcuff the City from ever reorganizing its operations. Although the outcome is the same for the employee whether the City's action is a discharge or a reorganization, sections 7–104(19) and 7–101 are not applicable to the latter situation. *Cf. id.* at 1409–10. The Plaintiffs therefore have failed to show that the Defendants breached the City Charter.

## OPEN MEETINGS LAW

The Plaintiffs also allege that the June 13, 1988 Personnel Board meeting failed to

---

532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). A property right is generally recognized if "by statute, rule or contract, express or implied, the employee can only be fired for 'cause.'" *Ventetuolo v. Burke,* 470 F.Supp. 887, 891 (D.R.I.1978), *aff'd,* 596 F.2d 476 (1st Cir. 1979).

**5.** Of course, a position cannot be abolished as a mere pretext to get rid of a particular employee. *Hartman v. City of Providence,* 636 F.Supp. 1395, 1417–18 (D.R.I.1986) (citing *Ryman v. Reichert,* 604 F.Supp. 467, 468 (S.E.Ohio 1985)).

Although the Court found that the Plaintiffs' political affiliation was a substantial factor in the reorganization, the Court also concluded that the Plaintiffs' positions would have been abolished regardless of their affiliation.

**6.** In the Plaintiffs' Pre-Trial Memorandum, the Plaintiffs extensively quote *Joslyn v. Kinch,* 613 F.Supp. 1168 (D.R.I.1985), as if invoking a talisman for their due process claim. In *Joslyn* the Court rejected all due process claims. 613 F.Supp. at 1178–79.

comply with requirements of the Rhode Island Open Meetings Law and the Board's actions should therefore be declared null and void. The Defendants respond that this Court lacks subject matter jurisdiction over the claim and that the Plaintiffs are not "aggrieved persons" covered by the statute. While the Court concludes that it does indeed have subject matter jurisdiction and that Plaintiffs may avail themselves of the statute's protections, the Court nevertheless declines to declare the Board's actions null and void.

First, this Court has subject matter jurisdiction even though the statute only authorizes complaints to be filed in Rhode Island Superior Court. R.I.Gen.Laws § 42–46–8 (1985). A state has no right to limit a federal court's jurisdiction. *E.g., Railway Co. v. Whitton's Administrator,* 80 U.S. (13 Wall.) 270, 286, 20 L.Ed. 571 (1871) ("Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such a case, is not subject to State limitation."). *See generally* C. Wright, *Law of Federal Courts* 273–77 (4th ed. 1983) ("State Attempts to Limit Federal Jurisdiction"). This Court may therefore exercise its pendent jurisdiction powers to consider this claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

The Defendants next contend that the Plaintiffs are not "aggrieved persons" because the lack of notice of the Board's meeting was not causally related to the abolishment of their positions. An aggrieved person is an individual who has been denied some personal or property right. *Roullard v. McSoley,* 54 R.I. 232, 235, 172 A. 326, 327 (1934). As discussed above, the Plaintiffs did in fact have a property interest in continued employment, albeit not in perpetuity. If the Plaintiffs' allegations are correct, they certainly quali-

fy as aggrieved persons. It is difficult to imagine a situation in which a person is more aggrieved than when his or her job is abolished.

The Plaintiffs must then prove that the Personnel Board violated the Open Meetings Law by failing to post notice. Assuming *arguendo,* however, that the Plaintiffs have met their burden, they are not automatically entitled to relief. The Open Meetings Law expressly states that it is within the Court's "discretion" to declare the Board's activities null and void. For the following reasons, the Court declines to declare the Board's activities null and void.

First, the reorganization and abolishment of Plaintiffs' positions are not unlawful *per se.* A city may reorganize its operations to promote efficiency. *Joslyn,* 613 F.Supp. at 1176. Second, the widespread reorganization has been fully implemented. Rendering the Board's actions null and void "by means of a mandatory injunction would create administrative and fiscal chaos." *Hudson v. School Dist. of Kansas City,* 578 S.W.2d 301, 314 (Mo.Ct.App.1979) (Missouri "Sunshine Law").[7] Moreover, although Plaintiffs may not have had notice of the Board's meeting, they did receive notification of the Board's decision the following day. Finally, the Plaintiffs had the opportunity under the City's Personnel Rules and Regulations to appeal the Board's decision, but chose not to do so.

Accordingly, Plaintiffs' request for relief under the Open Meetings Law is denied.

## SECTION 1985

Lastly, the Plaintiffs conclude their claims by asserting that Defendants Sarault and Roque willfully and intentionally deprived the Plaintiffs of the equal protection of the laws, or of equal privileges and immunities under the laws, in violation of 42 U.S.C. § 1985. Because, however, the Court finds no violation of the Plaintiffs'

---

7. Had the Court found a *constitutional* violation, a return to the status quo may have been warranted. Under this statutory scheme, how-ever, even if the Open Meetings Law is violated, a court expressly has the discretion to decline voiding the actions in question.

rights, they fail on this claim as well.[8]

ORDERED, that Judgment will enter for the Defendants, with costs.

SO ORDERED.

---

**8.** The Court therefore need not even reach the question of whether the Plaintiffs qualify as "any person or class of persons" under § 1985(3). *Cf. Harrison v. KVAT Food Manage-* *ment, Inc.,* 766 F.2d 155, 163 (4th Cir.1985) (Republicans as a class are not protected by § 1985(3)).