**Janet Anne SMITH, Plaintiff,**

v.

**Robert L. HARRIS, et al; Defendants.**

**Janet Anne SMITH, Plaintiff,**

v.

**Norman CURTIS, et al; Defendants.**

**Civ. A. Nos. 79–0206 S, 81–0418 S.**

United States District Court,
D. Rhode Island.

March 31, 1983.

Roney and Labinger by John Roney, Lynette Labinger, Jean Musiker, Providence, R.I., for plaintiff.

Gorham & Gorham by John Gorham, Edmund L. Alves, Jr., Providence, R.I. and Higgins, Cavanagh & Cooney, Providence, R.I. by Joseph A. Cavanagh, for defendants.

## OPINION AND ORDER

SELYA, District Judge.

These civil actions present grave and important constitutional issues, and simultaneously raise the nefarious spectre of political infiltration where it least belongs—in the public schools. The litigation can best be characterized as acrimonious. It represents the culmination of conflicts (real and imagined) which, over the years, have rent asunder the tranquility of one of Rhode Island's most attractive exurban enclaves, pitting neighbor against neighbor and educator against educator.

Since the saga unfolds within the confines of a smallish rural community, and since it focuses on interpersonal relationships in an intimate and often perjorative manner, the cast of characters is of particular significance. Therefore, the Court at the outset feels constrained to set forth herein a brief listing of the *dramatis personae* as viewed through the eyes of the finder of facts.

### I. DRAMATIS PERSONAE

JANET SMITH: A self-styled gadfly and would-be Scituate school teacher, she

boasted of "giving the superintendent and the School Committee a hard time."

RICHARD L. HARRIS: Scituate Town Treasurer and kingpin of the local G.O.P.; if you believe his foes, Richard J. Daley is alive, well, and living in Scituate—and has traded his donkey for an elephant.

ALBERT A. MANNING: Long-time Scituate school superintendent, who proclaimed himself to be "his own man"; but this litigation questions whether he was king or pawn.

NORMAN CURTIS: Principal at Clayville School, he was not thrilled by Manning's involuntary transfer maneuvre.

CARL JOHNSON: Curtis' counterpart at Hope Elementary School, he was worried about the effect of plaintiff's activism on the morale of his faculty.

JOHN MORRISSETTE: Principal at North Scituate Elementary School ("NSES"), he was center stage for much of the drama that unfolded.

NANCY H. BORDEN: A poised, articulate member of the School Committee, she would probably have cross-questioned Manning if he had recommended plaintiff for a job.

ROBERT E. WATSON, JR.: Member of the School Committee, his scribbled notes may have been open to varying interpretations.

LESTER L. YOUNG: Brutally frank and plain-spoken, his abecedarian educational philosophy spurred plaintiff to run for political office.

SIDNEY R. AMYLON: Literal and precise member of the Scituate School Committee whose familiarity with the Mugwumps endeared him to the Court.

ANTHONY A. COIA: Loyal member of the Scituate School Committee, inclined to follow Manning's recommendations.

DR. WILLIAM LAWTON: Distinguished Director of Laboratory Experiences for the Education Department at RIC, he would have made certain that prospective student teachers knew the rules.

DR. PAUL F. JOYCE: North Smithfield Superintendent of Schools and an official of the N.W. Region, he termed the plaintiff's approach as an "unusual" one.

MARIE HAWKES: "Teacher of the Year" for Scituate and for the State of Rhode Island; plaintiff's classroom mentor.

VICTORIA RICCI: A teacher's teacher, her hospitalization helped to precipitate a firestorm.

MARJORIE ADKINS: She cleaned out her classroom in December, never to return to NSES.

ELIZABETH SHARON CAPOBIANCO: She helped the plaintiff sort out the reading problems which Adkins had left behind.

ANN FORNARO: A teacher much in demand, it was bruited about that she would be "bumped" by one with "pull".

MS. SCHOCKNER: Ms. Smith replaced this itinerant art instructor, only to be replaced herself.

LINDA PARRILLO: A conscientious and refined educator, she bore the brunt of plaintiff's wrath in early 1978.

JOHN MARTINELLI: Plaintiff's compatriot on the Democratic Town Committee, he started a petition drive and then skipped off on vacation.

NICETTE BALUKJIAN: Californian-turned-Rhode-Islander-turned-NSES-substitute-teacher.

MARIE GRISSOM: Concerned for her child, she presented the February 28th parents' manifesto to no avail.

WAYNE SALISBURY: His racket was to find a tennis instructor; despite Manning's chariness, he served plaintiff to the School Committee.

DEBORA GREENGLASS: Both the teachers' advisory panel and the superintendent put her at the head of the list.

BERNADINE DiORIO: Director of Curriculum for the Scituate School Department, and a dedicated professional who testified without embellishment.

JEAN DUBE: A highly-rated docent, she opted for the cosmopolitan delights of Woonsocket in lieu of Scituate's more pastoral splendors.

SHERRYL CARLOMUSTO: An applicant for a full-time elementary faculty posi-

tion, her extra-curricular activities gave her an edge over the competition.

NANCY ZITO: Like cream, she floated to the top.

JUDITH OSWALD: She brought to the Scituate schools a familiarity with innovation and with open concept education.

ELLEN D'AGNENICA: Selected in preference to the plaintiff, she chose to go elsewhere in order to pursue her specialty.

CYNTHIA KEATING: She followed in her parents' footsteps.

LINDA MARZAHN: Her efforts to rank teacher aspirants were deemed *ultra vires.*

DONALD CAMPBELL: A mystery man who played Paul Revere in warning the defendants that a lawsuit was coming.

MARY CHATALIAN: Although a friend of Ms. Smith, her testimony was not four-square with the plaintiff's.

FREDERICK REISMAN: A local plumber, he claimed to have flushed out an admission that plaintiff was "too hot to handle."

THE UNKNOWN CUSTOMER: Still unidentified, his or her testimony could have resolved any doubt as to who said what to whom during the shoot-out at the North Scituate Pharmacy.

## II. TRAVEL OF THE CASE.

Janet Smith unsuccessfully sought, over a period of years, a full-time teaching position with the Scituate School Department. She concluded that her failure to secure such employment was but a thinly-veiled punishment for her involvement in Democratic politics and for her activism in municipal affairs. Accordingly, she filed suit in 1979 against a bevy of defendants, seeking injunctive and declaratory relief and damages for putative violations of the First and Fourteenth Amendments to the Constitution of the United States and of 42 U.S.C.

§§ 1983 and 1985.[1] Some attrition has occurred with the passage of time and with the granting of various pre-trial motions; consequently, the sole remaining defendants in the 1979 action are the town treasurer, the school superintendent, and divers former and present members of the Scituate School Committee.

In 1981, the plaintiff brought a second action against Curtis and Johnson, both of whom were, at all times relevant to this action, school principals in Scituate. From these two defendants, plaintiff sought compensatory damages for alleged violations of the same constitutional and statutory provisions.[2]

The two cases were consolidated and tried to the Court in January of 1983, the parties having waived trial by jury. At the conclusion of the bench trial, the matter was taken under advisement, and compendious post-trial briefs were prepared and filed. The within opinion constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. For ease in reference, this opinion will treat the two civil actions as if there were but a single multi-defendant suit before the Court.

## III. THE PUBLIC SCHOOL SYSTEM.

Prior to dissecting the facts of this case, it is, in the Court's judgment, useful to recount the applicable law and procedures regulating the administration of public schools.

In Rhode Island, each local school district is governed by an elected School Committee. R.I.Gen.Laws § 16–2–5. The School Committee employs a superintendent to administer and supervise the schools, under and subject to its direction. *Id.* at §§ 16–2–9(b) and 16–2–11. Among other duties, the superintendent "shall recommend teachers, including principals, supervisors, and

---

1. Plaintiff's 42 U.S.C. § 1985 claim was dismissed in a Memorandum and Order by Judge Raymond J. Pettine, dated October 24, 1979. *Smith v. Harris,* et al, C.A. No. 79–0206 (Oct. 24, 1979).

2. Plaintiff's 42 U.S.C. § 1985 claim in her second lawsuit was never formally dismissed but should be and hereby is for failure to allege any class-based animus. *See* note 1, *supra.*

assistants, to the school committee for appointment to service in the public schools." *Id.* at § 16–2–11. The School Committee has final authority, however, for the engagement of teachers. *School Committee v. Board of Regents,* 429 A.2d 1297, 1301 (R.I.1981); R.I.Gen.Laws § 16–2–18. Any person appointed to a teaching position must possess a "certificate of qualification issued by . . . the state board of regents for education." *Id.* at § 16–11–1.

In addition to full-time teachers, there are two categories of substitute teachers. A *per diem* substitute is enlisted on a daily basis, for consecutive periods of up to twenty days. Under Rhode Island law, there is no requirement that a regular teacher be replaced by the same *per diem* substitute each day. *School Committee v. Board of Regents,* 429 A.2d at 1301. Nor does a *per diem* substitute have any contractual right to work more than one day at a time. *Id.* Long-term substitutes, on the other hand, work for consecutive periods ranging from twenty days to one-hundred and thirty days, and are paid more than *per diem* substitutes. Long-term substitutes customarily receive certain rights under the collective bargaining agreement between the teachers' union and the School Committee; *per diem* substitutes do not.

In virtually every instance, each community is in effect a school district and operates its public schools under and pursuant to this paradigm. Scituate's school department is, therefore, a branch—albeit a relatively autonomous one—of the local government; and the members of the School Committee (who serve staggered terms) are chosen by the voters of the town at regular municipal elections. There is no pretense of, nor requirement for, non-partisanship; in Scituate, School Committee candidates can—and almost invariably do—run under party labels as part of a local slate.

While the selection methodology for substitute teachers may vary from community to community, the practice in Scituate has been (i) for each school principal to arrange for *per diem* substitutes as needed in his or her school, and (ii) for the superintendent of schools to nominate long-term substitutes, who are then approved by the School Committee in the same fashion as full-time teachers. These selection devices antedate plaintiff's involvement with the Scituate schools, and there is no basis in this case for any suggestion that the methods themselves are constitutionally deficient; plaintiff's grievances, as will appear *infra,* are addressed to the manner in which the procedures were applied.

Defendant Manning was, at all times relevant to this case, the superintendent of the Scituate schools. Three elementary schools were under his jurisdiction: Hope, NSES, and Clayville. During the relevant time period, defendant Johnson was the principal at Hope, and defendant Curtis was the principal at Clayville. Morrissette, the principal at NSES, was not sued.

Defendants Borden, Watson, Young, Amylon and Coia were all members of the School Committee during the pertinent period.

## IV. GENERAL STATEMENT OF ISSUES.

Two generic inquiries confront the Court in this case. It must first be determined to what extent, if at all, the plaintiff engaged in the exercise of constitutionally protected First Amendment rights; and secondly, whether or not any such protected activities were in fact and in contemplation of law the cause of the defendants' decisions regarding the plaintiff's employment.[3] Answering these two questions requires the exercise of judicial tamisage by a careful sifting of the facts presented at the trial.

## V. FINDINGS OF FACT.

At all times material to this action, the Republican Party dominated Scituate politics. By way of illustration, Republican-en-

---

3. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977).

dorsed candidates captured every elected position in the municipal government in every election from 1974 through and including 1980. Each member of the School Committee during that period was elected from the Republican column.

Plaintiff and her family moved to Scituate in 1972. Her two children attended NSES. Plaintiff testified that she was "made to feel different" when she registered to vote in the town, because she registered as a Democrat. She also felt "discriminated against" in 1974, when she did not receive certain Republican campaign literature, even though she was known to be a Democrat.[4]

Undaunted by the Republican Party's control of elected offices in Scituate, or perhaps inspired thereby, plaintiff became active in municipal politics. She was a Democratic candidate for the Scituate School Committee both in 1974 and 1978. In the intervening campaigns (1976 and 1980), she made unsuccessful bids for the Scituate Town Council, again under the Democratic banner. In 1982, she ran on the Democratic ticket as the candidate for State Representative, and was defeated once more. She was, throughout, an active member of the Scituate Democratic Town Committee.

Plaintiff often attended Scituate Town Council meetings and the annual financial town meetings.[5] She was not noted for her silence at these meetings; to the contrary, she was vocal and outspoken on a variety of issues. She was often at odds with, or demanding explanations of, the decisions and pronouncements of both elected and appointed municipal officialdom.

Early on, plaintiff became extremely involved in education issues. She participated in the Parent/Teacher Organization ("PTO") for NSES. In 1974, she became a volunteer teacher's aide at NSES, where she toiled with individual third grade students for one and one-half years (and where she did commendable work). In 1975, she organized a parental protest against certain threatened cuts in the school budget. She later served a term as PTO chairperson. She attended School Committee meetings regularly, and voiced her opinions freely on a myriad of issues.

Plaintiff portrays herself, throughout this period, as a distaff Don Quixote, tilting with bureaucratic windmills. There is no credible evidence, however, that the town fathers viewed her at this time as either an adversary or as a serious challenge to their hegemony. In June of 1975, for example, the School Committee appointed her to serve on the Citizens Advisory Committee ("CAC"); and plaintiff also became a member of the Philosophy of Education Committee. Parents, teachers, students, school administrators and clergy served on the latter committee, which had been established to develop a statement of goals for the Scituate School Department.

Plaintiff decided at this point to make teaching her vocation. Accordingly, she returned to Rhode Island College ("RIC") in the fall of 1975, and enrolled in the Master of Arts in Teaching program.[6] In the spring of 1976, plaintiff was required to enlist for student teaching for the next semester. She chose the Scituate School Department, grade 3, as her first prefer-

---

4. It strikes the Court as singularly unreasonable for a registered Democrat, running that year as an endorsed candidate of that party for local office, to read something sinister into the failure of the opposition party to distribute its campaign literature to her. It should also be noted that, in a day and age when both direct mail and door-to-door leaflet drops are practiced to excess by political hopefuls, many citizens would consider any such omission to be far more of a blessing than an affront.

5. R.I.Gen.Laws § 45-5-1 gives the Town Council general power to manage the affairs and

interests of the town. Each town is required to hold a town meeting annually or biennially. *Id.* at § 45-3-1.

6. Plaintiff was an undergraduate at RIC from 1960-62. She left school in November, 1962, and joined the staff of Bradley Hospital as a clinical care worker for children. She retired in 1965. In 1970, she returned to school at the University of Rhode Island, from which she graduated in 1974, receiving a B.A., with distinction, in psychology.

ence for placement. On the back of her application, she explained her choice by stating that she would need to keep her afternoon non-teaching job while student teaching, and would therefore prefer a placement close to her home. RIC acceded to plaintiff's preference and tentatively assigned her to student teach in the third grade classroom at NSES, under the supervision of Marie Hawkes.[7] According to Manning, plaintiff at that time discussed with him the possibility of student teaching at NSES. He told her that he had no objection, and inquired why she had asked. She replied: "Because I'm a Democrat." He assured her that her political affiliations made no difference. Her placement was subsequently approved by Morrissette, Manning, and the School Committee at its April 13, 1976 meeting.[8] Plaintiff testified that she considered this placement to be a "plum" position.

After the School Committee's vote, Manning spoke with plaintiff again. During this conversation, plaintiff expressed surprise at the School Committee's approval of her placement, as the School Committee members were all Republicans and she was a Democrat. Manning responded to the effect that the School Committee's action proved the irrelevance of political affiliation. Plaintiff began her student teaching in September of 1976. She received an "honors" grade from both Hawkes and RIC upon completion of her practice teaching that December.

It is undisputed that, during the fall of 1976, plaintiff and defendant Harris[9] had a chance meeting at the local pharmacy. Their versions of this encounter differ in several respects. According to plaintiff, she told Harris that she was student teaching and would be applying for a teaching position in January. He allegedly replied, "We cannot hire everyone who applies." Plaintiff testified that while she took his comment in a waggish vein, she found his use of the term "we" to be both significant and disturbing. According to Harris, however, when he entered the pharmacy, plaintiff was engaged in conversation with an-

7. At the time plaintiff was assigned to student teach at NSES, RIC had a firm policy against placing student teachers in a school where their children were pupils. Plaintiff's two children were then attending NSES, but she did not reveal this information to RIC. According to Dr. Lawton, the Director of Laboratory Experiences at RIC, plaintiff was informed of this policy during a meeting with him on February 23, 1976. The meeting was held to discuss student teaching placements and the applications were filled out during the meeting. While Lawton could not state with certainty that plaintiff was at the meeting, he testified unequivocally that if she was excused for any reason, he would have met with her separately and imparted the same information.

Plaintiff testified that she missed this meeting, received no such individual forewarning from Lawton, and was therefore unaware of the policy. Plaintiff's application for student teaching, however, was dated February 23, 1976; and the Court finds as a fact that she was present at the session.

Even if one were to believe plaintiff's testimony as to ignorance of this rule, the following directive appears at the bottom of the application: "List any school to which you should not be assigned and the reason for that judgment, e.g., the presence of immediate family on the staff or siblings in the student body, neighborhood schools, etc." Defendants' Exhibit V.

Plaintiff testified that she did not think the directive required her to reveal that her two children were attending NSES. This testimony, taken in context, is difficult to swallow, even if digested with the aid of the proverbial grain of salt—especially when combined with her failure to answer the "family data" portion of her application. Defendant's Exhibit U. Plaintiff's testimony on these rather minor points indicates an evasiveness which characterized much of her testimony on more salient matters as well.

8. Manning testified that at the time he approved plaintiff's placement, he was unaware of the RIC policy discussed in note 7, supra. He became aware of this policy in August, 1976, in connection with the placement of another student teacher, Ann Fornaro. He realized then that this policy would affect plaintiff's placement, but he chose to ignore it.

9. Harris is and has been the elected Town Treasurer, and is a former Republican Town Committee chairman. Plaintiff ascribes to him essentially the same degree of control and influence over the governmental affairs of bucolic Scituate that the late Mayor Richard J. Daley was reputed to have exercised in Chicago's more urban environs.

other customer. He asked if she had been out campaigning, to which she nodded in the affirmative. She continued her conversation with the third party, and then said in a loud voice, "They have to hire me for the School Department-I'm the only qualified candidate." Harris testified that he turned to her and responded that approximately two hundred teachers applied for each vacancy in the school system. Harris further testified that he found plaintiff's comment offensive because he felt that she was trying to get a reaction from him, even though he had nothing to do with the hiring of teachers for the Scituate schools. Harris made an excellent appearance on the witness stand, and his demeanor impressed the Court. His version of the pharmacy incident is, in the Court's view, credible.

Harris and Manning frequently discussed federal grants which the School Department was receiving, a subject of mutual interest. As town treasurer, Harris was responsible for banking and accounting with respect to these funds. During one of these conversations, Harris mentioned his encounter with plaintiff. Harris stated that he was curious why plaintiff seemed so self-assured of placement when budget constraints, as he understood them, precluded additional teacher hirings at that time. Manning responded that no teaching positions were open. Plaintiff insinuates that it was in this discussion that Harris, wielding his political influence, branded her with the scarlet letter which sealed her fate in future employment endeavors.

Manning and Harris both testified, however, that Harris never expressed an opinion regarding plaintiff's employment; and Manning testified that Harris never ordered him to hire, or not to hire, any applicant for a teaching position. The Court

finds these facts to be so, and rejects plaintiff's conspiratorial view of the Harris/Manning dialogue.

In January of 1977, plaintiff applied for a substitute teaching position with the School Department. Manning told her that he would submit her name to Morrissette, Curtis and Johnson for possible *per diem* assignment. According to plaintiff, Manning then said: "Janet, I received a call from Bob Harris. He does not want you to have any position [in this School Department] that is long-term or permanent." Manning thereupon offered to help her find a full-time job elsewhere. She thanked him, but told him that she wanted to teach in her own town.[10] Manning disagrees.

He testified that he did, at the time of this application, discuss employment with plaintiff, but told her that no teaching positions were immediately available, and encouraged her to apply elsewhere, offering his help. Plaintiff responded that Scituate had to hire her because she was the most qualified, and "the Republicans could do nothing about it." Manning again pointed out the job situation in Scituate, and told her, paternalistically in his view, "You do not get a job by going around in drug stores telling the town treasurer that the town has to hire you." Plaintiff asked him if her politics made any difference, to which he replied: "I'm my own man; I make my own recommendations." The Court accepts Manning's account of this colloquy. If a political black-ball had in fact been cast, and if Manning were, as plaintiff suggests, a willing pawn of such gamesmanship, his efforts to help plaintiff to secure substitute-teaching placement and his sponsorship of plaintiff anent the N.W. Region would defy all logic.

10. In the summer of 1977, however, plaintiff, at Manning's urging, applied for the position of project director for the "Gifted and Talented Program" run by the N.W. Region. She was interviewed for that post by a board of five school superintendents. According to the testimony of one such interviewer, Dr. Joyce, plaintiff was seen at Manning's request. Joyce testified that he remembered plaintiff's interview because of her "unusual" approach: she introduced herself to the panel members as "the person who gives Mr. Manning and the Scituate School Committee a hard time." Plaintiff denied making the statement, but the Court finds Joyce to be the more credible witness in this regard.

This incident, while peripheral, aptly illustrates the chip-on-the-shoulder attitude which the Court believes has probably impeded plaintiff's vocational progress generally.

Shortly after this conversation with Manning, plaintiff began teaching in all three of the Scituate elementary schools as a *per diem* substitute. She was one of the most frequently used *per diem* substitutes in the Scituate School Department. Her day-to-day in-classroom work while substituting was performed competently. From January, 1977 to June, 1977, plaintiff substituted for a total of fifty days. She taught for a further twenty-three days during the fall of 1977, and for twenty-eight days during early 1978. Manning was presumably aware of the frequency of her engagements as he reviewed all substitute teacher payroll records. Harris, too, had access to such knowledge, as the pay-checks were processed in the town treasurer's office.

In February of 1977, plaintiff was called to substitute for the elementary school art teacher, who rotated among the three elementary schools. Plaintiff was not certified to teach art. After two weeks of this duty, Morrissette then asked her to teach the sixth grade class at his school: she did so for one week. A school vacation week followed. For one ensuing week, plaintiff was asked to pinch-hit again in the art position. Morrissette needed a *per diem* substitute for Victoria Ricci's split third/fourth grade class at his school that same week, and called Ann Fornaro.[11] When Ricci's continued absence required

the appointment of a long-term substitute, Manning gave Fornaro the assignment, since she was already teaching this class.

By this time, it had become apparent that the art position, too, would require a long-term substitute, and plaintiff, as the incumbent *per diem* substitute, hoped that she would be so appointed. Manning, however, insisted that the long-term substitute be an individual duly certified to teach art.[12] This directive was consistent with his policy of requiring all long-term substitute teachers to be certified for the positions assigned in order to insure compliance with state law regarding teacher certification. The principals of the schools, collectively, acting in response to Manning's mandate, forthwith located a certified art teacher; and, over the weekend of March 5–6, Morrissette called plaintiff and told her that her services were no longer needed for art instruction. Upset and indignant, plaintiff reached first Curtis, and then Manning, by telephone.[13]

Plaintiff was infuriated that she had lost not only the art rotation, but the perceived opportunity to become the long-term substitute for Ricci's third/fourth grade class. On March 9, 1977, she called Ricci (who was hospitalized) to discuss the situation. Plaintiff, according to Ricci's testimony, told her that she had enough "pull" to have Fornaro "bumped" from the long-term substitute

11. According to plaintiff, Morrissette called her and asked if she would substitute for the third/fourth grade position, but then told her that the principals preferred her to remain in the art position. She testified that she expressed her preference for the former position, as it was the grade level for which she had trained and in which she was certified (whereas she was not certified to teach art). Morrissette then told her that the principals were depending on her for the art job and that her lack of certification was not a problem.

Morrissette, a generally credible witness throughout, denied offering plaintiff a choice and denied telling her that her lack of certification was not a problem. The most he could have said was that certification was not a problem for *per diem* substitute teachers.

Based on the consistent testimony of the defense witnesses regarding the importance of certification, *infra,* the Court finds it impossible to believe that Morrissette told plaintiff that

certification was "not a problem", and rejects the plaintiff's account of this dialogue.

12. Defendant Borden testified that the School Committee had questioned Manning about plaintiff's appointment as a *per diem* substitute for the art position. The School Committee was concerned that the students were being disserved because plaintiff lacked training and certification for teaching art. Borden was an articulate, credible witness on this and other points.

13. These conversations were surreptitiously tape-recorded by plaintiff, but she claims to have "misplaced" the recordings; they were never aired at trial. Further, plaintiff testified at trial that she taped only a portion of the Curtis conversation. In an earlier deposition, however, she stated that she had taped the entire conversation. Plaintiff's testimony regarding the recorded conversations was less than forthright.

position. Ricci testified that she thought plaintiff was talking about "political pull" since plaintiff "was always talking about politics." Ricci, troubled by this conversation, reported it to Morrissette. He reassured Ricci; and he did not report the incident to Manning.[14]

Later that month, plaintiff spoke with Manning and told him that she wanted to attend an executive session of the School Committee to discuss her complaints. He arranged for her to appear at the executive session on March 22, 1977. The minutes of that meeting state in part:

> Mrs. Smith was upset by the fact that while substituting for Miss Schockner [the art teacher], she refused a possible long-term substitute position for the grade she was trained for, and, therefore, she claims [she] has lost the seniority she would need for a full time position, should an opening occur. The School Committee asked questions, stated that they understood her position and objections, but they had followed the teachers' contract in placing a certified art substitute in an art position.

Minutes of the Scituate School Committee Executive Meeting, March 22, 1977, at 1 (Plaintiff's Exhibit 4). Plaintiff, as noted above, continued to serve betimes as a *per diem* substitute in the Scituate elementary schools.

In late December of 1977, Morrissette was notified by Marjorie Adkins, a second grade teacher at NSES, that she was ill. The class was, at the time, plagued by reading-related problems. Morrissette called Fornaro to substitute for the class, but she was engaged elsewhere. He then called plaintiff, who began teaching the Adkins class as a *per diem* substitute on January 2, 1978.

When plaintiff arrived at the school, she discovered that Adkins, whom Morrissette had recently criticized for poor teaching, had removed all materials and personal effects from the classroom. Plaintiff rebuilt the classroom, began preparing lesson plans, and with assistance from Morrissette and from the departmental reading specialist, Elizabeth Capobianco, realigned the children into proper reading groups.

In late January, Adkins submitted her resignation, effective February 1, 1978. Manning and Morrissette met to decide how to fill the Adkins vacancy. Both men testified that, although plaintiff had performed well as a substitute, they hoped to find a more experienced teacher with special reading skills. Manning testified that he also wanted to avoid posting the opening as facially required by the collective bargaining agreement with the Scituate Teachers' Association ("STA"). He visualized an "involuntary transfer" as a means to achieve this end; having reached this conclusion, he settled on Linda Parrillo as a logical choice.[15] Parrillo, a half-day kindergarten teacher at Clayville, had just received a lay-off notice for the following school year due to uncertainty as to the need for maintaining her class, given a shrinking kindergarten-level school population; she wanted to teach on a full-time basis; she had five years of experience in the Providence school system at the second and third grade levels; she enjoyed a sterling recommendation from her superiors in Providence; and she had an "especially strong" background in reading.

Morrissette was ecstatic; he figuratively "jumped" at the chance to have Parrillo

14. Plaintiff denies that she made the "bumping" statement to Ricci, but the testimony of Ricci and of Morrissette, neither of whom is a party, contradicts her denial. The Court believes Ricci, who had no axe of any sort to grind, to have been entirely truthful in her testimony.

15. Manning testified that had he posted the Adkins position, a third grade teacher at Clayville would have applied for, and received, the Adkins class. The third grade vacancy would then have been posted, for which Parrillo would have applied. No one in the bargaining unit would have bid for Parrillo's kindergarten position because it was half-time and in danger of being eliminated. It would therefore have been necessary to fill the latter position with substitute teachers. The STA filed a grievance as a result of Manning's decision not to post. The grievance was resolved when the positions were posted for the 1978–79 school year.

teach at his school. He knew her favorably from her work as a substitute there, and had previously authored a laudatory letter of recommendation, praising her reading-related skills. Parrillo, too, was delighted. Other than from plaintiff, the sole demurrer came from Curtis, who was less than pleased with Manning's plan. Plaintiff's attack in this litigation on these teacher shifts makes much of the fact that the transfers were implemented despite Curtis' protest. The Court finds, however, that Curtis had only a single objection: he was disconsolate at the necessity of transferring Parrillo from Clayville because he hated to lose a good teacher.

Manning decided to appoint Fornaro, who was then substituting for Ricci, as the long-term substitute for the vacancy created by Parrillo's transfer. Fornaro was amendable to this translocation. Fornaro had previously taught school in Cranston, Rhode Island; she had received honors in student teaching "from the best kindergarten teacher in Scituate"; and she was experienced in the "Exceptionally Ready" program then used at the kindergarten level. Curtis had never met Fornaro, but he testified that this was a minor concern. Manning offered Fornaro thirty dollars a day for the half-time position to make it economically feasible for her to accept the offer, and to give Curtis additional help at Clayville.[16] Morrissette enlisted Nicette Balukjian to fill the vacancy in the Ricci classroom created by Fornaro's defection to Clayville. Balukjian had previously been a full-time teacher in California, and Morrissette had received glowing reports from teachers for whom she had substituted since her arrival in Rhode Island.

The orchestration of these changes was delayed somewhat by the occurrence of a mammoth blizzard, which shut down the state and its schools for a week. School resumed on Monday, February 13, 1978. Plaintiff was unaware of the new arrangements until the next morning, when Morrissette told her that February 17th would be her last day as a *per diem* substitute for the Adkins class, and that Parrillo was being involuntarily transferred to the position. According to plaintiff, Morrissette then said, "Jan, they hate you, what did you ever do to make the School Committee hate you? It's Harris who's doing it." Morrissette flatly denied making these remarks. The Court credits his denial.

Plaintiff wasted no time in calling Parrillo and asking her to refuse the position. Parrillo declined to do so. The plaintiff then asked Parrillo for a list of the names and addresses of the children in the kindergarten class at Clayville. Parrillo refused to give her this information.[17] Plaintiff called Parrillo at least twice more during the following week. During one such call, plaintiff boasted to Parrillo that her lawyer had promised that she "would be in that classroom by June."[18] Parrillo reported at least some of these contacts to Morrissette. Morrissette prepared three memoranda to Manning concerning the calls. Manning, in turn, reported them to the School Committee.

The parents of the children in the Adkins class were concerned about continuing teacher shifts in the classroom. John Martinelli, a parent, testified that he talked with plaintiff and with Morrissette about the change. Morrissette told him that it was "out of his hands," and Martinelli decided to prepare a petition to the School Committee "in protest of their actions." The petition was dated February 17, 1978, and stated in part:

16. Since Parrillo had been paid as a regular member of the bargaining unit while in the Clayville kindergarten, the offer of thirty dollars a day represented a savings of several thousand dollars to the school system.

17. At trial, plaintiff testified that she could not remember asking Parrillo for this list. The Court finds that she did request it.

18. Plaintiff first contacted a lawyer in February, 1977, about possible litigation. At that point she began keeping records (and tape-recorded the two telephone calls discussed *ante* at n. 13).

[O]ur children during the current school year will have been taught by three different teachers for various periods of time which has, we feel, disrupted the normal learning process and is not in the best interest of our children.

Plaintiff's Exhibit 8.

Plaintiff helped to circulate and to obtain signatures on the petition. Plaintiff admitted under cross-examination that she had a dual motive for so doing: (i) she was concerned for the children from an educational perspective, and (ii) she wanted the job herself.

At the next School Committee meeting (February 28, 1978), Marie Grissom, a parent, presented the petition. Plaintiff was in attendance with her attorney. According to paragraph ten of her complaint in C.A. No. 81–0418, Plaintiff sought to "express [ ] her dissatisfaction over her denial of these positions and attempt [ ] to change the decision of the School Department and/or the School Committee of the Town of Scituate." She did not, however, speak publicly during this session. In fact, there was no colloquy. The School Committee declined to hold an open forum on the petition at the February 28th meeting; instead, an announcement was made that the matter would be placed on the agenda for the School Committee's March 7, 1978 meeting. According to exhibits here of record, however, the School Committee did turn its attention to the subject during its executive session on February 28th. At that time, the School Committee considered the petition and voted to send a letter to the parents explaining the transfer(s) and the underlying rationale. Plaintiff's Exhibit 7. Watson's notes[19] reflect the School Committee's concerns:

Petition a certainty:

Martinelli's husband drafted—

Janet Smith pushed—

bad mouthing Fornaro—

parents being used [,] i.e.,

sev[eral] changes in teachers will hurt children . . .

Adkins—

*strong sub v. selected smart replacement talented in grade weakness. . . .*

Plaintiff's Exhibit 10 at 2, 3 (emphasis added).

At the March 7, 1978 School Committee meeting, a prepared statement regarding Parrillo's involuntary transfer was read publicly on behalf of the School Committee. No floor debate was permitted.

Prior to the Adkins incident, plaintiff had done most of her work at the behest of Morrissette.[20] Thereafter, plaintiff substituted only once more in the Scituate elementary schools. This date, April 6, 1978, had been scheduled well in advance.[21] Morrissette testified that, although plaintiff had performed well in the classroom, he was troubled by her telephone calls to Parrillo and her circulation of the petition. His faculty was upset over the incident and he was concerned that plaintiff's presence at the school would create a morale problem. He did not discuss these concerns with either of his fellow principals.

In the spring of 1978, Wayne Salisbury, the head of the adult education program for the Scituate School Department, called Manning to tell him that he wanted plaintiff as a tennis instructor for this program. Plaintiff had taught the course in 1974, 1975 and 1976—each time with School Committee approval. Salisbury testified that in 1978, for the first time, Manning asked him to find an additional nominee or nominees.

---

**19.** The notes, admitted into evidence as Plaintiff's Exhibit 10, are dated only "2 & 3—1978".

**20.** Plaintiff had not taught for Johnson at Hope since September 22, 1977. Curtis had called her to substitute at Clayville only four times following the art substitute incident. Selection of *per diem* substitutes rested, as hereinbefore noted, in the sole discretion of the affected school principal.

**21.** It should be recognized that, starting with the fall term in 1978 and continuing thereafter, plaintiff was largely unavailable for substitute assignments in Scituate because of her acceptance of teaching duties in Providence, detailed *infra,* first as a substitute and thereafter in a permanent teaching post.

Manning was fearful that the School Committee might not approve plaintiff's appointment because of the controversy she had generated.[22] Nevertheless, Salisbury eventually submitted only plaintiff's name to Manning. Manning recommended her to the School Committee, and her appointment was approved on a four-to-one vote. Borden, who felt that plaintiff lacked judgment and had acted unprofessionally in calling Parrillo, dissented.

In June of 1978, the School Committee announced six vacancies for elementary teaching positions, two at Clayville and four at Hope. Plaintiff applied for these positions, as did several hundred other candidates. Johnson and Curtis evaluated the applications and selected fifty-two, including plaintiff, for preliminary interviews.[23] The first-round interviewing team consisted of Johnson, Curtis, three teachers from Hope, and three teachers from Clayville.

After the initial week of interviews, the six teacher-members of the team met separately and ranked the twenty-one applicants who had theretofore been interrogated. The teachers gave the highest ranking, a 9–10, to Debora Greenglass. Six applicants, including plaintiff, received a ranking of 8–9. The teachers relayed these rankings to Johnson, who informed Manning. Manning refused to accept these *ad hoc* ratings, however, stating that the teachers had no authority to rank applicants.[24] No attempt was made by the teachers to grade any applicants who were subsequently interviewed.

Once the hiring process was completed, nineteen finalists, including plaintiff,[25] were screened by a quartet comprising Manning, Curtis, Johnson and Bernadine DiOrio, the director of curriculum for the School Committee. This panel, immediately following each interview, evaluated each of the nineteen in ten distinct categories. Manning testified that each principal then voiced his preferences for the positions at his school. In most instances, the principal's choice prevailed. Manning made recommendations accordingly to the School Committee for final approval. Harris was in no way involved in any facet of the selection process.

DiOrio testified that the panel did not discuss any applicant's political affiliation: to the best of her knowledge, politics were never in issue. DiOrio also testified that the panel did not consider plaintiff's actions in February, 1977 regarding the art substitute position, her activities in February and March, 1978 surrounding the Adkins classroom, or any of her political activities. DiOrio's testimony was straightforward, unembellished, and bore the hallmark of authenticity.

Neither Curtis nor Johnson preferred plaintiff for any of the positions, even though both men thought she had performed well as a substitute teacher. Johnson testified that he told Curtis, during the screening, that he did not want the plaintiff at his school because she "expressed her opinions too freely." By this, Johnson meant "opinions in general." He explained that plaintiff "always seemed to be talking about something or someone." The Court finds as a fact that Johnson's concern in this regard was a permissible one—that is, his interest in maintaining harmony, morale, and a spirit of cooperative endeavor at Hope. He was in no way seeking impermissibly to penalize plaintiff for legitimate exercise of her First Amendment rights.

Thus, plaintiff was not among the candidates vouchsafed to the School Committee

22. The position paid $171.00 for the duration of the session.

23. An additional applicant, Debora Greenglass, was also interviewed.

24. Manning cited the Staff Development Policy ("SDP") for this proposition. The SDP submitted as Plaintiff's Exhibit 24 states that "teacher team members shall submit in writing their views on the applicants under considera-

tion." Plaintiff's Exhibit 24 at 6 (24–7). An addendum to the SDP, adopted by the School Committee, stated that "the interview team will recommend three or more candidates, without ranking, to the superintendent for the final interview." Defendant's Exhibit N at 2.

25. The finalists comprised 14 selected by the interview team plus five additional applicants.

for appointment.[26] Although plaintiff was well qualified, the record demonstrates that each of the teachers presented to the School Committee and offered a job (with the exception of Cynthia Keating) either possessed more teaching experience than did plaintiff or was certified to teach in more than one area, an important consideration for a small school district. A brief discussion of each such individual and of the qualifications of each follows.

Fornaro was selected for the kindergarten class at Clayville. This was the same position to which she had been appointed on an interim basis in February of 1978. Fornaro's credentials are discussed *ante*; she had, since February, successfully handled the very job in question; and had received unanimous encominums in her final interview for a position.

Greenglass, appointed to grade two at Hope was an experienced teacher from Massachusetts. Manning testified that she was an individual with "extraordinary vitality" and had made a "tremendous impression" during her interview. The teachers' *ad hoc* committee apparently agreed, as she was their top-ranked candidate. *See ante.*

Jean Dube, one of Manning's former students, was nominated for the sixth grade position at Hope. She had arguably the best academic record among the applicants, and carried dual certification in both elementary and special education. Manning testified that she was the most impressive candidate among the finalists interviewed. Dube declines the offer of employment, however, as she had been offered, and had accepted, a special education position in the Woonsocket, Rhode Island schools.

Sherryl Carlomusto was then nominated for the sixth grade position. She had taught remedial mathematics during the previous year, had excellent academic records, and honors in elementary school student teaching. In addition, she was active in extra-curricular activities in the school system, such as teaching ballet and pottery after regular school hours.

Nancy Zito was nominated to teach grade two at Hope, where she had been a long-term substitute for a second grade class during the 1976–77 school year. She had excellent academic credentials and fine student teaching recommendations.

Judith Oswald was appointed to grade six at Clayville. She had previously taught in New York and New Hampshire and had good recommendations from these jobs. Morrissette and Curtis had visited the school in New Hampshire where she taught (which was famed for its innovative programs), and had been duly impressed. She had a needed familiarity, as well, with "open concept" education.

Ellen D'Agnenica, a reading specialist, was also offered a job. She received a job in her chosen field in another system, however, and so declined the Scituate offer. She was an experienced teacher with dual certification in reading and elementary education.

Cynthia Keating was appointed to grade five at Hope in place of D'Agnenica. She brought to the competition good recommendations for her substitute teaching, strong scholastic credentials, impeccable references and excellent reports on her student teaching. She had also studied Portuguese and was interested in bilingual education. Her parents were well-respected educators.

The Court has evaluated the personnel files and other material of record concerning these teachers, and had the benefit of hearing testimony not only from Manning, Johnson, Curtis and DiOrio, but also from Dube, Fornaro, Zito, Carlomusto and from teacher-members of the first-round interview team (Parrillo and Linda Marzahn). The Court is persuaded, as a matter of fact, that the successful aspirants were all competent, highly qualified professionals; that the reasons advanced by Manning for the

---

**26.** The School Committee members were given information on each candidate and on the finalists interviewed by the panel, who remained on a back-up list. Manning testified that only once during his tenure as superintendent did the School Committee reject one of his nominees for a teaching or nonteaching job.

selections were not pretextual; and that the hiring process was implemented neutrally and objectively.

Manning relayed the schedule of nominees to the School Committee on July 28, 1978. On July 31, 1978, he sent the School Committee members a follow-up memorandum which stated, among other things, that: "[Donald Campbell] [27] told me that if Janet Smith doesn't get a job Tuesday night [the August 1, 1978 School Committee meeting] she is immediately going to sue on the grounds of 'political discrimination.'" Plaintiff's Exhibit 27 at 27–6. Plaintiff was not appointed and this suit followed.

Manning, in response to a detailed hypothetical question, testified that he would not have recommended plaintiff for any one of the six openings even if none of the following had occurred: (i) her conversation with Harris in the fall of 1976; (ii) her actions regarding the art substitute position in February, 1977; (iii) her circulation of the petition for the Adkins class in February, 1978; (iv) her telephone calls to Parrillo regarding the Adkins class; (v) her attendance at the February 28, 1978 School Committee meeting with her attorney; and (vi) her threats to sue the School Committee. According to Manning, plaintiff simply was not among the most proficient of the applicants and was, therefore, not among those selected for recommendation to the School Committee. The Court accepts Manning's testimony in this regard.

Several School Committee members testified regarding the August, 1978 appointments. Borden stated that she had reviewed the records of all of the finalists and was satisfied that those recommended by Manning were the most qualified. She testified that had Manning recommended the plaintiff for one of the positions, she might have voted against her, but probably would have simply questioned him and then accepted his recommendation.

Young impressed the Court as being brutally frank. He testified that he voted almost reflexively for all of Manning's recommendations because "he's the expert." Young admitted, however, that he did not know if he would have voted to appoint plaintiff had Manning recommended her.

Watson testified that he approved the individuals recommended by Manning because of his faith in the evaluation system which had theretofore been devised to select finalists. Watson was satisfied that the screening was properly carried out. He testified that had plaintiff been nominated through this system, he would have voted in her favor.

Sidney Amylon stated that the School Committee's most important function was the hiring of teachers. The selection process was established so that the best possible candidates would be hired, and he was confident that this had been accomplished. Amylon admitted that he felt plaintiff hurt her chances for a job by her activities surrounding the art substitute and Adkins positions.[28] He testified, however, that had Manning recommended plaintiff, and assured him of her ability to work with other teachers and with the administration, he would have voted for her.

Anthony Coia testified that he voted for the six finalists on the basis of Manning's recommendation. Had Manning recommended plaintiff, he would unhesitatingly have endorsed her for a permanent position.

The Court finds that each of these five elected officials testified as to this crucial point in an honest and truthful manner.

---

**27.** Campbell is something of a mystery man in this melodrama; he has not been identified except as a Scituate resident.

**28.** Frederick Reisman testified that in late February, 1978, he and Amylon discussed plaintiff. Reisman testified that Amylon told him that plaintiff was not appointed to a long-term position because she was "probably politically a little too hot to handle," but that if she "kept a low profile, she would probably get a job even-

tually." Amylon testified that he and Reisman probably did discuss plaintiff but he denied stating that she was "politically too hot to handle." Amylon said that he may have said that plaintiff's chances would be better "if there were less school politicking," meaning things like "rallying parents on the petition *to her own ends.*" (Emphasis added). The Court finds that Amylon did not make the statement quoted by Reisman in the words attributed.

Plaintiff testified that she had been very depressed and upset when she lost the Adkins class.[29] When she was not selected for one of the six positions in the summer of 1978, however, she felt resigned because she "knew it was coming." Later that month, she was hired by the Providence school system as a substitute teacher. She taught there for one hundred twenty-two days in the 1978–79 school year and for one hundred thirty days in 1979–80. During this same period, she returned to college on a part-time basis and obtained a second certification (in special education). In 1980, plaintiff obtained a full-time teaching position in Providence, which she still holds.[30]

## VI. APPLICABLE LAW.

### A. The Mt. Healthy Standard

As an applicant for a public teaching job, and as a substitute teacher for a public school department, plaintiff may establish a claim under the First and Fourteenth Amendments if defendants' decisions regarding her employment were made because she engaged in constitutionally protected activities. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977); *Perry v. Sinderman,* 408 U.S. 593, 597–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972). To establish such a claim, plaintiff must show that her conduct was constitutionally protected and that such protected conduct was a "substantial" or "motivating" factor in the defendants' decisions. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576. If plaintiff meets this initial burden, the Court must then determine whether defendants have shown, by a preponderance of the evi-

dence, that they would have reached the same decisions as to plaintiff's employment regardless of the protected conduct. *Id.*

### B. First Amendment Considerations

■ The First Amendment protects the right of every citizen to speak his or her mind, free from government censorship or sanction. *Pickering v. Board of Education,* 391 U.S. 563, 572–73, 88 S.Ct. 1731, 1736–37, 20 L.Ed.2d 811 (1968); *Waters v. Chaffin,* 684 F.2d 833, 837 (11th Cir.1982); *Pilkington v. Bevilacqua,* 439 F.Supp. 465, 474 (D.R.I.1977), *aff'd,* 590 F.2d 386 (1st Cir. 1979). Yet when the citizen is a government employee, directing the speech towards a government employer, the employee's First Amendment rights must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. at 568, 88 S.Ct. at 1734. One consideration involves the nature of the speech in issue, including such factors as whether the speech is defamatory or false; whether the speech relates to matter of public interest; and whether the forum involved is appropriate. *Id.* at 569–73, 88 S.Ct. at 1735–37. A second consideration involves the actual or potential impact of the speech both upon the employment relationship and upon the efficacy of the public service. Relevant factors include whether the speech was directed at someone with whom the speaker maintained a close working relationship (such as an immediate superior); whether the speech might disrupt discipline or harmony among co-workers; and whether the job is, by its nature, sensitive to differences of opinion. *Id. See generally* Note, *Free Speech and Impermis-*

---

**29.** Plaintiff's claims as to some of the humiliation and the like which she allegedly suffered were impeached by a comparison of her testimony with that of Mary Chatalian, a long-time Scituate teacher called as a witness by the plaintiff. While it is not necessary to catalogue the particulars of the events in question as they are at best ancillary occurrences, the discrepancies between plaintiff's version of these events and that of Chatalian, an earnest lady who plainly thought well of plaintiff and was

her friend, are illuminating. The Court does not question Smith's good faith, but it does appear that, due perhaps to her initial fears and preconceptions, she looks back on her experiences in the Scituate school system through a darkened glass, and that her recollections of historical detail seem to be warped by her self-imposed perspective.

**30.** Additional findings of fact are incorporated in Part VII, *post.*

*sible Motive in the Dismissal of Public Employees,* 89 Yale L.J. 376 (1979) ("*Note*").

■ When the speech is public, the content of the teacher's statements must be assessed to determine whether they impede the proper performance of classroom duties or interfere with the regular operation of the schools. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979). The likelihood of undercutting a superior's ability to maintain discipline or of inciting discord among co-workers militates against a finding that the speech is protected. *See Pickering v. Board of Education,* 391 U.S. at 570, 88 S.Ct. at 1735. At the same time, the public nature of the speech highlights salutary First Amendment interests in truth-seeking and in robust public debate. *See Pilkington v. Bevilacqua,* 439 F.Supp. at 474. It is neither happenstance nor coincidence that "Veritas!" is the credo of one of this nation's most venerable and most highly regarded universities; the pursuit of the truth is, indeed, central not only to our republic and to our American way of life but also to the integrity of our educational institutions. *Pickering* recognized that it is "essential" that those public officials who are most knowledgeable about a matter of public importance by virtue of their involvement with it "be able to speak out freely on such questions without fear of retaliatory dismissal." *Pickering v. Board of Education,* 391 U.S. at 572, 88 S.Ct. at 1736. *Accord Pilkington v. Bevilacqua,* 439 F.Supp. at 474.

■ If the speech is directly within the context of the workplace, such as a personal confrontation with an immediate superior, the employer's "institutional efficiency may be threatened not only by the content of the employer's message but also by the manner, time, and place in which it is delivered." *Givhan v. Western Line Consolidated School District,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4. Nevertheless, a professional motivated by a good-faith commitment to excellence should not lightly be inhibited from speaking out, either to supervisors or to coworkers, on matters clear-

ly relevant to the common undertaking. *Pilkington v. Bevilacqua,* 439 F.Supp. at 478 n. 11. *See Bernasconi v. Tempe Elementary School District No. 3,* 548 F.2d 857, 862 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 82 (1977). Some latitude must necessarily be afforded both as a matter of personal dignity and for the ultimate good of the profession. In any event, unless there is a serious threat of disruption to institutional efficiency, an individual "cannot be deprived of constitutional protection because he voiced from within matters that were entirely appropriate for public discussion and of current public interest." *Pilkington v. Bevilacqua,* 439 F.Supp. at 476.

When the speech is made in private, however, away from the workplace and not to superiors but to fellow employees not directly involved or to acquaintances, another First Amendment interest comes into play. Every individual has a legitimate interest in maintaining a zone of privacy where he or she can speak about work without fear of animadversion. *Waters v. Chaffin,* 684 F.2d at 837. While not couched in the majestic language customarily associated with our society's fundamental liberties, freedom of speech does indeed incorporate a right to gripe; but as with freedom of speech in general, such a right can validly be circumscribed within sufficiently cogent perimeters. Freedom to gripe is not exercisable in any manner nor in all events. The government may restrict actions of its off-duty employees in certain ways, but these restrictions may not "unnecessarily impinge upon private, social conversations", even those conversations which are palpably tactless or disparaging of a fellow employee or of a superior. *Id.* at 838. In the absence of compelling countervailing considerations, the judiciary should be "loathe to sanction the intrusion of the government's ear into the private lives of its employees." *Id.* at 839.

Moreover, substantially greater weight must be attributed to the employee's interest in free speech if the employee "is commenting on a matter of general interest or acting as a whistleblower exposing corrup-

tion among public officials rather than merely trying to advance his own interests as an employee." *Foster v. Ripley,* 645 F.2d 1142, 1148 (D.C.Cir.1971). In *Foster,* for example, the Court of Appeals gave less weight to the employee's First Amendment interests because he was blatantly engaged in a "mere power struggle [with] his superior, in which the employee attempted to subvert his superior's actions by attacking them through external rather than internal channels." *Id.* at 1149.[31]

## VII. CONCLUSIONS OF LAW.

For ease in discussion, the Court will bifurcate its conclusions of law as to two generic types of conduct: (i) plaintiff's partisan political activities and community activism generally (the latter being limited to her pre-1977 civic involvement only); and (ii) plaintiff's work-related activities (including conduct referable thereto occurring away from the purlieu of the workplace). The last-mentioned classification will, in turn, be discussed in terms of four separate generative incidents: (i) the art substitute rotation; (ii) the Adkins' classroom; (iii) the adult education program; and (iv) the teacher hirings in mid-1978. While discussed under separate rubrics, the Court has at each stage considered the cumulative effect (if any) of prior protected conduct and of reactions fairly attributable thereto.

### A. *Plaintiff's Partisan Political Activities*

Plaintiff has alleged that her overall partisan political activities and her non-work-related participation in community and School Committee affairs constituted protected acts; and that this conduct was, in the aggregate, a "motivating" factor in defendants' decisions regarding her employment. Plaintiff introduced no probative evidence at trial in support of these allegations; they rest, in the main, upon her own subjective beliefs. Plaintiff's testimony regarding the importance of partisan politics

in selecting Scituate school teachers consisted largely of her comments to Manning in April, 1976, when her student teaching placement was approved, and Manning's alleged recital of Harris' ultimatum in early 1977. Plaintiff concedes that Manning made no incriminating remarks during the 1976 meeting; and, as discussed *supra,* the plaintiff's version of the January 1977 events is not credible. Plaintiff alleges that her February 14, 1978 conversation with Morrissette also raised the spectre of political taint, but the Court has noted *ante* its disbelief that the conversation in question took place along the lines described by the plaintiff.

No credit-worthy evidence in this record even intimates that partisan political activities were considered by any defendant involved in the selection of either long-term substitute teachers or permanent elementary teachers. DiOrio, a disinterested witness, denied that political affiliation was a factor in the teacher selection process, as did every defendant who was asked. The Court readily acknowledges that parties-defendant are not likely to admit, in so many words, to playing politics with the schools. But in this case, a fair collocation and assessment of the totality of the circumstantial proof patently supports the defendants' disclaimers. Defendants conceded at trial that political party affiliation may not be a consideration in the appointment or hiring of teachers, as teaching is a non-policy-making position within the meaning of *Branti v. Finkel,* 445 U.S. 507, 517, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Their collective actions in Smith's case adhered to this standard.

Plaintiff's activities in attending and speaking at financial town meetings and at School Committee meetings are unquestionably protected by the First Amendment. *Pickering v. Board of Education,* 391 U.S.

---

**31.** The Court of Appeals held that the agency's internal reorganization (which led to the power struggle) conceivably was a matter of public interest, as to which the employee had a First Amendment right to speak. *Foster v. Ripley,* 645 F.2d at 1149. On the other hand, however, it was clear that the employee's actions would have caused considerable harm to the agency and would have disrupted working relationships and effectiveness. *Id.*

at 572–73, 88 S.Ct. at 1736–37; *Waters v. Chaffin,* 684 F.2d at 837; *Pilkington v. Bevilacqua,* 439 F.Supp. at 474. Defendants deny that plaintiff's general participation in these activities influenced their decisions regarding her employment. The Court accepts their denials as there was no sufficient showing of any antagonism toward the plaintiff simply because she was a community activist. The minutes of the various meetings reflect no untoward enmity, nor do they portray a pattern of hostility. Rather, the evidence showed that after she had become a familiar figure in community affairs, the School Committee asked her to serve as a member of the CAC, and approved her student teaching placement. Manning likewise approved her student teaching placement, accepted her application for substitute teaching, informed the principals of her availability, and offered to help her find a permanent post. As noted above, he sponsored her as the town's choice for the N.W. Region opening. The School Committee thrice approved her appointment as an instructor in the adult education program (1974, 1975, 1976). The defendants would not have taken these actions if they had wanted to punish or to deter plaintiff's activism in general.

It is plain to the Court that the plaintiff, early on, developed some paranoia concerning the effect which her political leanings and her bent for militancy might have on her quest for a teaching position; and that she herself is convinced that these fears have proven to be well-founded. Such trepidation cannot substitute in a court of law for the niceties of proof. While the plaintiff sees the Scituate school system as a jungle wherein the twin pourridies of political partisanship and repression of dissenting opinion have infected the very roots, no such infestation is apparent from, nor supportable by, the evidence adduced at trial. In these respects, the plaintiff's mind-set has rendered her unable to see the forest for the trees. The Court finds that the Scituate school system has been run, over the years at issue, in a generally responsible manner, and that neither a penchant for repressive totalitarianism nor any undue deference to the political power base of the town have dictated or impinged upon the hiring practices of the School Department.

The Court will turn directly to the specific school-related incidents addressed by the trial evidence to see if these support the gravamen of the plaintiff's case. There are four such series of incidents. They will be discussed chronologically.

#### B. *Plaintiff's Pursuit of Employment*

At the onset, the Court must note that the plaintiff's overwhelming interest in each and all of the activities here in question was that she be given a job. This interest was purely personal. It places this plaintiff in stark contradistinction to her counterpart in *Pickering v. Board of Education,* 391 U.S. at 564, 88 S.Ct. at 1732, who was dismissed for writing a letter to a local newspaper critical of the school board's handling of school revenue proposals, or to the social worker in *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977), who was penalized for informing superiors of administrative irregularities in the food stamp program, or to the employees in *Pilkington v. Bevilacqua,* 439 F.Supp. at 474, and *Bernasconi v. Tempe Elementary School District,* 548 F.2d at 862, who were punished for advocating the rights of their clients.

As the plaintiff's interests in her speech were neither altruistic nor particularly high-minded, *see Foster v. Ripley,* 645 F.2d at 1148–49, emphasis must be placed on determining whether her speech genuinely threatened the potential employment relationship and the efficient operation of the Scituate schools. *See Givhan v. Western Line Consolidated School District,* 439 U.S. at 415 n. 4, 99 S.Ct. 696 n. 4.

#### 1. *The art substitute imbroglio*

In early 1977, plaintiff was upset that she was not appointed to the art substitute position or to the long-term substitute position for Ricci's third/fourth grade class. She took her grievance to Manning, and thereafter to the School Committee during

its executive session[32] and complained that she had been treated unfairly in not being appointed to the art position, even though she had no art certification (or alternatively, that she should not have been by-passed for the Ricci classroom). Both discussions were essentially private and in the nature of personal confrontations between plaintiff and her superiors. There was a dearth of evidence that the institutional interests of the Scituate schools were harmed by plaintiff's confabulations either with Manning or with the School Committee.[33] School superintendents and school boards are frequently subjected to criticism for many different reasons, and the statements by the plaintiff, without more, should not be expected unduly to disconcert these officials. *See Meyr v. Board of Education,* 572 F.2d 1229, 1233 (8th Cir.1978). As there was no true harm to the schools' institutional interests, *Givhan v. Western Line Consolidated School District,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4, plaintiff's First Amendment rights should prevail, notwithstanding her purely personal interests in that speech.

The Court need not decide, however, whether plaintiff's speech in these two confrontations is entitled to the protection of the First Amendment. From the evidence in this case, it is obvious that Manning's decision to replace plaintiff as an art teacher was motivated solely by the fact that she was not certified to teach art; and the Court so finds. Manning had long enforced a policy that long-term substitutes had to be certified in the specialty in question. The School Committee, as well, was concerned both with maintenance of this salutary practice and with plaintiff's lack of certification credentials as an art teacher.

Thus, even if plaintiff's speech to Manning and to the School Committee regarding the art substitute position was protected, it was no factor in defendants' decision not to appoint plaintiff to that job. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576.

Neither was there any evidence that plaintiff's audiences with Manning and the School Committee skewed Manning's decision to appoint Fornaro as the long-term substitute for Ricci's third-fourth grade class. Fornaro was already in place as a *per diem* substitute by the time plaintiff complained to Manning and the School Committee. Once Manning and the affected principal, Morrissette, learned that Ricci's class would require a long-term substitute, it made perfect sense to appoint Fornaro to the position, as she was available, qualified, and already at the helm of that classroom. As Fornaro was a more experienced teacher than plaintiff, there was no good reason to prefer plaintiff initially over Fornaro; and there was even less warrant to supplant Fornaro with the plaintiff. The Court is constrained to find, on the instant record, that the decision to extend Fornaro's incumbency in this fashion was made for sound educational and managerial reasons wholly unrelated to any discriminatory animus against plaintiff.

From the evidence in this case, it is difficult to conclude that the art substitute episode had any effect whatsoever on defendants' actions regarding plaintiff's employment. Following her confrontations with Manning and the School Committee, she continued to be called with exceptional frequency as a *per diem* substitute. Further, it was subsequent to the enactment of this

---

**32.** Plaintiff's activities in recording her conversations with Manning and Curtis need not be considered, because neither defendant was aware that the tapes were made until after this litigation ensued. Plaintiff's telephone call to Ricci, during which she discussed her "pull" and ability to "bump" Fornaro, is also irrelevant because neither Ricci nor Morrissette contemporaneously informed any of the defendants of this call. The mere fact that ancillary conduct may have been indiscreet, or even underhanded, should not serve to strip expression

of constitutional protections which would otherwise attach. *See Waters v. Chaffin,* 684 F.2d at 838.

**33.** Given that plaintiff, a substitute teacher, was not a member of STA, her audiences with Manning and the School Committee were probably the only available way to proceed to air her perceived grievance. One could argue that the superintendent and the School Committee had an institutional interest in hearing the complaints of an employee so situated.

vignette that Manning sponsored plaintiff for the position in the N.W. Region. *See* note 10, *supra*.[34] For the foregoing reasons, the Court concludes that plaintiff failed to meet her *Mt. Healthy* burden of showing that her "protected conduct" was a "motivating" or "substantial" factor in the defendants' decisions not to appoint her to either the art position or to the Ricci classroom. *Mt. Healthy Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576. Moreover, defendants have proved decisively that they would have made the same decisions regarding these positions, irrespective of plaintiff's "protected conduct." *Id.*

### 2. *The Adkins donnybrook*

The next series of incidents are those surrounding the appointment of a long-term substitute for the Adkins classroom. Plaintiff's activities consisted of: (i) her telephone calls to Parrillo; (ii) her actions in connection with the petition to the School Committee; (iii) her appearance at the School Committee meeting on February 28, 1978 with her attorney; and (iv) her threats to sue the School Committee.

Plaintiff's telephone communications with Parrillo were made in private to a co-worker. Thus, plaintiff's First Amendment interests are those of privacy and the right to speak about work without fear of censure. *Waters v. Chaffin,* 684 F.2d at 837. Yet plaintiff's exercise of these First Amendment rights troubled Parrillo, so much so that Parrillo reported the calls to Morrissette, who reported them to Manning. Morrissette abhorred the situation because it upset his faculty and eroded morale. Thus, plaintiff's telephone calls unquestionably implicated the employer's interest in protecting its other employees and in preserving harmonious relationships not only among teachers, but also among teachers and the administration. *See Givhan v. Western Line Consolidated School District,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4. Taken in context, the reactions of both Parrillo and Morrissette to these conversations were neither unreasonable nor unforeseeable.

Moreover, plaintiff's interests in this speech were, in the Court's judgment, predominantly personal: according to Parrillo's testimony and to Morrissette's memoranda, plaintiff called Parrillo because she wanted Parrillo's post. Plaintiff first asked Parrillo not to accept the job, and later declaimed that she was going to oust Parrillo from the classroom in question by June. The true import of these polemics cannot be camouflaged behind plaintiff's proclaimed interest in either the children's progress or in Parrillo's adjustment to the classroom. Given that plaintiff's interests were personal, and not public, *see Foster v. Ripley,* 645 F.2d at 1148–49, and that her speech genuinely threatened the operations of NSES, the Court concludes that these calls were not protected speech. *Id.*

The defendants clearly considered plaintiff's telephonic diatribes in evaluating her future employment in the Scituate schools.[35] They did so, however, not because of the speech itself, but because of what the calls demonstrated about plaintiff's character. Parrillo thought plaintiff was "cutting her own throat" by involving innocent people, and told plaintiff as much. Borden, upon learning of the calls, thought that they indicated a lack of judgment and professionalism. Given the "special characteristics of the school environment", *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), and the

---

**34.** Plaintiff argues that Manning's sponsorship was evidence that he desired to exclude her from the Scituate school system. Manning's offer may more plausibly be viewed, however, as a recognition that plaintiff was a worthy individual who nevertheless would find it difficult to obtain a teaching job in Scituate simply because vacancies were few and the competition was fierce. In any event, Manning's actions vis-a-vis the regional position trumpet loudly that he bore no ill will toward plaintiff.

**35.** Plaintiff's telephone calls to Parrillo could not have affected defendants' decisions regarding the appointments of teachers in the shuffle necessitated by Adkins' resignation, however, as these decisions were made prior to the onset of the calls. *See* discussion *infra.*

importance of "effective teacher contribution to the educational process," *Megill v. Board of Regents,* 541 F.2d 1073, 1086 (5th Cir.1976), the traits evinced by these calls could properly be used by plaintiff's superiors in evaluating her competence and abilities. *Id.* at 1084. *See Lindsey v. Board of Regents,* 607 F.2d 672, 676 (5th Cir.1979); *Lyons v. Sullivan,* 602 F.2d 7, 10 (1st Cir.), *cert. denied,* 444 U.S. 876, 100 S.Ct. 159, 62 L.Ed.2d 104 (1979). Speech, however zealously its freedom must be guarded, can nonetheless be productive of realistic insights into the character, temperament and judiciousness of the protagonist. The First Amendment should not be construed to inhibit fair use of such insights for legitimate purposes in instances where the characteristics in question are plainly job-related.

Plaintiff's efforts in concert with the parents of the children in the Adkins' classroom in petitioning the School Committee fall within the category of public speech. Plaintiff was, in the first instance, communicating not with people in any employment relationship with the School Committee, but with those members of the public having the most immediate interest in the Adkins' classroom: the parents. Despite her admission that she had a selfish motive in helping with the petition, the actual speech contained in the document—an expression of concern anent the succession of teachers in the classroom—was of interest and concern to the public, and entirely appropriate for public debate. *See Pilkington v. Bevilacqua,* 439 F.Supp. at 476. Plaintiff should have reasonable latitude to speak on such an issue, regardless of her personal motives, without fear of retaliation. *Pickering v. Board of Education,* 391 U.S. at 572, 88 S.Ct. at 1736. That plaintiff's overwhelming motive in participating in this activity was a nonaltruistic one is outweighed in this instance by several other factors: the speech was public, it was not disparaging of school administrators or teachers, and it did

not in any material way impede the effectiveness of the schools. The Court therefore concludes that plaintiff's participation in the parents' effort to petition the School Committee constituted conduct protected by the First Amendment.

With respect to plaintiff's attendance, with her lawyer, at the February 28, 1978 meeting of the School Committee, there is no evidence of interference in the functioning of the Scituate schools or of the orderly business of the School Committee. For aught that appears, neither plaintiff nor her lawyer even spoke at the meeting. At most, this was a silent statement, made in public, exhibiting concern about her role in the Adkins classroom. Plaintiff's right to attend this public meeting cannot seriously be questioned; her right to be accompanied by her lawyer is equally clear.[36] Plaintiff's motive, in and of itself, is not the issue; absent any evidence of disruption, defendants could not, in evaluating plaintiff's suitability for employment, negatively assess plaintiff's mere attendance at the School Committee meeting without infringing upon her First Amendment rights.

Plaintiff's statements to private individuals regarding her intentions to sue Manning and the School Committee are not necessarily of a piece with simply having counsel in tow. These statements were made in private and for purely personal motives. Although Manning and the School Committee knew of plaintiff's statements, however, there is no evidence that these statements in any way sabotaged the operation of the schools or of the School Committee, or in any way impacted plaintiff's own performance as a teacher. Given that defendants' interests were not harmed by the content, time, place or manner of plaintiff's speech, *see Givhan v. Western Line Consolidated School District,* 439 U.S. at 415 n. 4, 99 S.Ct. at 696 n. 4, this Court concludes that defendants could not properly consider this

---

**36.** While the presence of an attorney may well have been viewed by some or all of the defendants as menacing, *see, e.g.,* C. Dickens, *Old Curiosity Shop* ch. 56, *reprinted in* 11 *The Works of Charles Dickens* 182 (Gadskill ed.

1897), the right of the plaintiff to engage, consult with, and be accompanied by, counsel in an open meeting is so fundamental as not to warrant extensive comment.

speech without infringing on plaintiff's constitutionally protected rights.[37]

As the discussion *ante* makes plain, at least some of plaintiff's activities surrounding the appointment of a long-term substitute for the Adkins' classroom were constitutionally protected. Nevertheless, there is no credible evidence that such behavior was a factor in Manning's decision (with which the School Committee concurred) to appoint teachers other than plaintiff to any of the several positions vacated in the aftermath of Adkins' resignation. Manning made his decisions regarding the involuntary transfer of Parrillo and the appointment of Fornaro *before* plaintiff undertook the activities discussed above. Those determinations were not, in the Court's view, tainted by any impermissible considerations. Parrillo and Fornaro both had more experience than plaintiff. Manning had a cogent rationale for his initial decisions; and there was no sound reason for him to change his plans upon hearing plaintiff's protests. It is not for this Court to weigh whether the schools would have been better served by a different teacher alignment, nor to second-guess the superintendent. An administrator's choice of personnel should not be disturbed where, as here, his selection has been made for independent, non-discriminatory, non-retaliatory reasons. Any constitutional protection accorded plaintiff's rights to orchestrate and to participate in parental protests does not, *ipso facto,* confer upon her any constitutional or legal rights to any of the jobs in question. In short, plaintiff has not met her burden under *Mt. Healthy* of showing that her actions were a "substantial" or "motivating" factor in defendants' decision not to appoint her to one of these positions in February of 1978. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576; *Pilkington v. Bevilacqua,* 439 F.Supp. at 473. In fact, all of the credible evidence in this case runs to the contrary.

### 3. *The tennis instructor position*

Only the briefest of comment is required concerning the plaintiff's contentions of unlawful conduct apropos her application and hiring as a tennis instructor in the adult education program for the spring of 1978. First and foremost, plaintiff received the desired appointment, thereby making moot any direct claim based on these events. Second, insofar as evidential value in gauging other aspects of the defendants' conduct, this teapot tempest does not advance plaintiff's cause. While Manning requested alternate nominees from Salisbury, the Court finds that he did so not out of ulterior purpose or as a prelude to reprisal, but as a prudent precaution against possible School Committee disapprobation of the plaintiff's nomination in the immediate wake of her self-cast starring role in the Adkins brouhaha. That this wariness proved eventually to be unnecessary is altogether immaterial, the circumstances considered.

### 4. *The summer of 1978*

The final question is whether or not plaintiff's "protected conduct" as limned above (including, for the sake of argument, her activities anent the art substitute position) was a "motivating" or "substantial" factor in defendants' decisions, arrived at in the summer of 1978, not to appoint her to one of the six full-time positions available for the school year 1978–79. While plaintiff's protected conduct in 1977 and 1978, when combined with her unprotected activities (including the telephoning of Parrillo), may presumably have made some impression on one or more of the defendants, the Court is not required, under the circumstances of this case, to address this inquiry directly. Suffice it to say that the Court

---

**37.** As no disruption or interference with the functioning of the schools occurred as a result of this speech, the only basis for objection relates to the content of the speech. The content referred only to plaintiff's plan to sue the defendants. Because the act of litigation is itself a form of expression protected by the First Amendment, *In re Halkin,* 598 F.2d 176, 187 (D.C.Cir.1979), any restriction on speech stating an interest in exercising that protected right must be viewed askance from a constitutional perspective. *See also, In re Primus,* 436 U.S. 412, 431, 98 S.Ct. 1893, 1904, 56 L.Ed.2d 417 (1978).

finds that any such negative impression was peripheral at worst, and was a condition—rather than a cause—of plaintiff's rejection.

The Court is persuaded that the teacher evaluation process employed in 1978 was not infected by any animus arising out of any or all of the plaintiff's previous protected conduct. While plaintiff may not have endeared herself to the defendants by her actions, lack of affection is not tantamount to deprivation of constitutional rights. What is of critical import is whether the plaintiff's credentials were fairly weighed in the screening procedure and in the ultimate decision-making. In this regard, the Court must credit the testimony of DiOrio, who flatly stated that plaintiff's conduct surrounding these incidents was never discussed nor considered by the quartet of school administrators charged with making the final recommendation. Once again, the absence of discussion of plaintiff's protected conduct during a panel selection process does not *per se* eliminate the possibility that unvoiced thoughts nevertheless played a part in the choices. It is admittedly difficult for those not gifted with the supernal powers of a Lamont Cranston to know to a certainty "what evil lurks in the minds of men". No credible evidence in this case, however, supports an inference that invidious forces were at work beneath the surface of the panel's deliberations.

It is, in the Court's view, highly significant that two defendants, Johnson and Curtis, were among those who selected plaintiff for the final interview in the first place. Confronted with an ideal opportunity to sweep plaintiff's candidacy for a permanent position under the proverbial rug, both principals nonetheless chose to move her up the ladder toward her goal. They would not, in the Court's judgment, have done so had they harbored any resentment toward plaintiff as a result of her activities.

Rather, the evidence makes it clear that the "motivating" or "substantial" factor in the individual decisions of Johnson, Curtis and Manning not to choose the plaintiff from among the finalists for recommendation to the School Committee was that she simply was not as qualified for the open positions as the candidates selected.[38] The School Committee itself, in turn, was guided almost exclusively by faith in the screening process and in the superintendent's nominations (having been satisfied that the approved methodology for applicant evaluation had been carried out).[39] The evidence showed that during Manning's tenure as superintendent, the Scituate School Committee had developed an objective procedure for comparing aspirants for full-time teaching positions. This method was logically aimed at bringing the cream to the top, i.e., in matching the most proficient candidates to available jobs. The Court finds nothing in the record which casts any reasonable doubt upon either the effectiveness of the Scituate merit selection system or the even-handedness with which it was applied in 1978. The facts demonstrate that plaintiff was unsuccessful because she did not, on the merits, deserve to succeed; simply put, there were other applicants more qualified than she. Manning's reply to the hypothetical question was, in the Court's judgment, grounded in fact.

By this finding, the Court does not intend to impugn plaintiff as unqualified. All of

**38.** Plaintiff makes much of her favorable ranking by the teacher-members of the first-round interviewing team. As discussed *supra,* that *ad hoc* rating endeavor was neither a part of the screening procedure *per se,* nor was it in any way binding. Moreover, it was incomplete in two important respects: (i) only first-week interviewees (approximately 40% of the applicants who reached this stage) were rated in this fashion, and (ii) these rankings were abstract, in the sense that no thought was given to matching the aptitudes of an individual candidate with any specific teaching slot. For

these reasons, the Court can attach little weight to this evidence. Parenthetically, it should also be noted that, of those aspirants who were both rated in this manner and also offered positions in the Scituate schools, Keating, Zito and Greenglass had scores equal to or better than plaintiff's.

**39.** To the extent that the School Committee defendants made on this occasion any independent assay of the candidate crop, their findings coincided *on the merits* with Manning's recommendations.

the evidence indicates that she was an industrious, motivated and well-trained professional—albeit comparatively inexperienced. The School Committee, however, had the luxury of choosing from an abundance of riches—and the plaintiff's gem sparkled with somewhat less lustre than that of the competition.

Based on the foregoing, the Court holds that plaintiff has failed to carry her burden of showing that her constitutionally protected conduct was a "motivating" or "substantial" factor in defendants' failure to hire her in 1978. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576. Her case against the defendants cannot, therefore, be sustained.

Even assuming, *arguendo,* that plaintiff succeeded in carrying her *Mt. Healthy* burden, the Court finds that the defendants amply met their correlative burden of showing, by a preponderance of the evidence that they would have reached the same decision as to plaintiff's employment, regardless of the protected conduct. *Id.* Several hundred teachers applied for the six jobs available at Hope and Clayville for the 1978–79 school year. Plaintiff was one of the nineteen finalists but was not offered a job. The record shows that each and all of the teachers offered positions were more qualified than plaintiff: as previously discussed, each had either more experience, or dual certification, or special talents which added depth and or versatility to classroom performance. Plaintiff, by contrast, admitted that she was a "novice" at teaching, and that she had only a single certification.[40] Given the defendants' genuine interest in hiring the best teachers available, the record cannot sustain a finding that defendants would have hired plaintiff "but for" her protected conduct.

These defendants were not, in the Court's view, on a search-and-destroy mission dedicated to gibbeting the plaintiff or to annihilating her professional ambitions. They were, to the contrary, engaged in

carrying out a legitimate talent hunt in a professionally acceptable manner. They did so without resort to impermissible criteria and in the absence of rancor or spite. The imprint of vendetta is not, as the plaintiff asseverates, stamped upon these proceedings; and the challenge to the defendants' actions is without basis in law or in fact.

## VIII. CONCLUSION.

While the plaintiff has doubtless suffered setbacks and unpleasantness on a somewhat rocky road toward a full-time teaching career, neither her constitutional nor her civil rights have been violated. Predicated upon the findings of fact and conclusions of law set forth herein, plaintiff has failed to establish a cognizable claim against any defendant upon which she is entitled to relief in this proceeding.

Judgment shall enter accordingly in favor of the defendants, and each of them, for costs.

---

40. It is interesting to note that plaintiff herself obtained a second certification before she was hired for a permanent position in the Providence school system in 1980.